IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-3564
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

WALTER RICHARD, LESBURN LLOYD DA COSTA, and HEADLEY WEIR,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

(June 22, 1993)

Before REYNALDO G. GARZA, WILLIAMS, and JONES, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

The government brings this interlocutory appeal of the district court's pretrial order to suppress evidence discovered in two motel rooms. The district court found that customs agents had violated the Fourth Amendment when they made a warrantless entry and search of a room at the Superdome Motor Inn in New Orleans, Louisiana. The district court also concluded that any consent given to search a room at the nearby Economy Motor Lodge was not voluntary. As a result, the district court suppressed most of the evidence discovered during the two searches. After reviewing the

1

record, we affirm the suppression of evidence found in the Superdome Motor Inn and reverse the suppression of evidence from the Economy Motor Lodge.

I.  FACTS AND PRIOR PROCEEDINGS

In January 1992, federal customs agent Robert Mensinger obtained information that the M/V HAVORN would arrive in Gramercy, Louisiana, with drugs attached to the hull. Mensinger and agent Barry Wood drove to Gramercy on January 31, 1992, and set up surveillance near where the HAVORN had docked. During the night, the agents discovered a van parked in the area and noticed that it contained, among other things, space for cargo, a diving tank, and a VHF marine radio. At 6:00 a.m., the agents saw a man run from the levee to the van and begin to drive away, but the agents stopped the van. Defendant Walter Richard emerged, wearing a diving suit.

The agents questioned Richard and searched the van, in which they found a card in the name of Dani Gonzalez and a beeper with the number locked in for the Superdome Motor Inn in New Orleans. For more than three years the agents had suspected Gonzalez of involvement in marihuana smuggling. Richard then admitted that he had been diving with two others, one of whom was called Johnny, and that Johnny was staying in Room 214 of the Superdome Motor Inn. While Wood arrested Richard, Mensinger called for local help to search the area for the other two men. Mensinger also requested by

2

radio that other agents meet him at the Superdome Motor Inn. Mensinger searched the ship area for one and a half hours. Then, he left Gramercy at 8:00 a.m. and reached the motel by approximately 9:00 a.m.

The agents first spoke with the Superdome Motor Inn's clerks, who confirmed that two men from Barbados were registered to stay in Room 214 and that the men had been making and receiving numerous telephone calls. The agents knocked on the door of Room 214 and announced that they were police officers. The agents contend that, although the occupants responded "Okay. Okay. Wait a minute," the door did not open immediately. The agents then say they heard people talking softly, doors or drawers slamming, and footsteps moving about. As they saw the doorknob turn, the agents kicked in the door and entered the room.

One agent immediately handcuffed defendant-appellee Headley Weir and patted him down for weapons. A patdown of defendant-appellee Lesburn Lloyd Da Costa revealed a .45 caliber pistol and a key to Room 241 of the Economy Motor Lodge. After arresting the men, agents learned that both knew Dani Gonzalez, who had been staying in the room with Weir. Da Costa claimed that he was staying at the Economy Motor Lodge, but had fallen asleep in Room 214 while waiting for Gonzalez. A further search of the room turned up a ledger and two address books marked as Gonzalez's.

Agents maintain that Da Costa then gave them permission to search his room at the Economy Motor Lodge, an assertion that Da Costa denies. Agents Sidney Roberts and Eileen Escoto went to Da Costa's room, which was occupied by Susan Collymore. After the agents informed Collymore that Da Costa had given consent to search the room, she admitted them, stating, "Well, I don't have anything to do with it. Search the room. Search anything you want. I don't have any part of this. I'm just here with my boy friend." The search produced four empty new suitcases, a box of trash bags, and three boxes of dryer sheets.

Richard, Weir, and Da Costa were indicted for conspiracy to possess marihuana with intent to distribute, conspiracy to import marihuana, and carrying firearms during drug trafficking activities. Da Costa was also charged with being a felon in possession of a weapon. Before trial, the defendant-appellees filed motions to suppress evidence. The district court denied Richard's motion and refused Da Costa's request to suppress evidence found in Room 214 of the Superdome Motor Inn. Nevertheless, it granted Weir's motion to suppress the evidence found in Room 214 of the Superdome Motor Inn and Da Costa's motion to suppress evidence discovered in Room 241 of the Economy Motor Lodge. The government has timely appealed.

## II.  DISCUSSION

We consider the evidence in the light most favorable to the prevailing party when we review the granting of a motion to suppress.  The district court's factual findings are accepted unless they are clearly erroneous.  Questions of law are considered *de novo*.  United States v. Capote-Capote, 946 F.2d 1100, 1102 (5th Cir. 1991), cert. denied sub nom. Rodriquez v. United States, --- U.S. ---, 112 S.Ct. 2278, 119 L.Ed.2d 204 (1992).

### A.  Entry and Search at the Superdome Motor Inn

The Fourth Amendment protects people in their homes from unreasonable searches and seizures.  The Fourth Amendment requires probable cause to obtain a warrant either to arrest a suspect in his home or to search the home.  This Fourth Amendment protection is extended to guests staying in hotel rooms.  Stoner v. State of Cal., 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). Warrantless searches and seizures inside someone's home are presumptively unreasonable unless the occupants consent or exigent circumstances exist to justify the intrusion.  Payton v. New York, 445 U.S. 573, 586, 590, 100 S.Ct. 1371, 1380, 1382, 63 L.Ed.2d 639 (1980).  Thus, if agents have no warrant and no consent, even if they have probable cause and statutory authority to arrest a suspect, they must also have exigent circumstances to enter. Arizona v. Hicks, 480 U.S. 321, 327-28, 107 S.Ct. 1149, 1154, 94 L.Ed.2d 347 (1987) ("A dwelling-place search, no less than a dwelling-place seizure, requires probable cause . . . .").  Because

5

consent was not an issue in the entry of Room 214, we focus on the presence of exigent circumstances.

Exigent circumstances include hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others. Capote-Capote, 946 F.2d at 1103. A district court may consider several relevant factors when determining whether exigent circumstances exist. These factors include:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant;
>
> (2) [the] reasonable belief that the contraband is about to be removed;
>
> (3) the possibility of danger to the police officers guarding the site of the contraband while a search warrant is sought;
>
> (4) information indicating the possessors of the contraband are aware that the police are on their trail; and
>
> (5) the ready destructibility of the contraband and the knowledge "that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic."

United States v. Thompson, 700 F.2d 944, 948 (5th Cir. 1983) (citing United States v. Rubin, 474 F.2d 262, 268 (3rd Cir.), cert. denied, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973)). Exigent circumstances, however, do not pass Fourth Amendment muster if the officers deliberately create them. United States v. Webster, 750 F.2d 307, 327 (5th Cir. 1984), cert. denied, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985).

The district court found that exigent circumstances arose when the agents knocked at Room 214's door. The court, however, also found that the agents had manufactured the exigencies by knocking on the door and announcing that they were police officers. The government argues on appeal that the court clearly erred in its finding that the exigencies were contrived. The presence of exigent circumstances is a finding of fact, so the inquiry is whether the finding was clearly erroneous. United States v. Vasquez, 953 F.2d 176, 179 (5th Cir.), cert. denied sub nom. Gomez v. United States, --- U.S. ---, 112 S.Ct. 2288, 119 L.Ed.2d 212 (1992).

The agents concede that the reason they went to the motel room was to try to locate Dani Gonzalez. They had only a reasonable suspicion that Dani Gonzalez was in Room 214. Consequently, they did not seem to have considered a warrant a possibility. The agents testifying at the suppression hearing told the court that they were conducting an "investigative stop" to determine Gonzalez's whereabouts. The supervisor stated that the agents intended to enter the room one way or another to further that investigation. Because the officers thought they had only reasonable suspicion and not probable cause, there was no justification for either a warrant or a warrantless search. The agents' own testimony belies the government's original argument that exigent circumstances justified the warrantless entry.

Nevertheless, the district court concluded that probable cause for a search warrant existed. The government concedes the finding on appeal. There is no question that agents conducting an ongoing investigation do not need to obtain a warrant at the first opportunity. Thompson, 700 F.2d at 949. If exigencies arise before agents can obtain a warrant, they can justifiably act. After reviewing the record, however, we find that the district court did not clearly err when it found that the agents had created the exigencies.

In considering claims of manufactured exigency, we "distinguish between cases where exigent circumstances arise naturally during a delay in obtaining a warrant and those where officers have deliberately created the exigent circumstances." Webster, 750 F.2d at 327. In United States v. Hultgren, 713 F.2d 79, 87-88 (5th Cir. 1983), we held that exigent circumstances arose naturally when the transmitter worn by a confidential informant participating in a drug buy suddenly failed. Concern for the confidential informant's safety justified the warrantless entry. On the other hand, we held a warrantless entry to be illegal because of manufactured exigency in United States v. Scheffer, 463 F.2d 567, 574-75 (5th Cir.), cert. denied sub nom. Stretcher v. United States, 409 U.S. 984, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972). In Scheffer, co-defendants who had already been arrested were helping agents to catch other members of a drug conspiracy. Agents sent the cooperating defendants into a residence to consummate a

8

drug deal and then made a warrantless entry to arrest the residents.  We refused to accept the government's argument that the agents lacked the time to obtain a warrant, because the agents controlled the timing of the drug buy.

The exigencies claimed by the government are the possibility of destruction of evidence and danger to the officers.  To support its argument, the government relies on United States v. MacDonald, 916 F.2d 766 (2d Cir. 1990) (en banc), cert. denied, --- U.S. ---, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991).  MacDonald is inapposite, however.  In that case an undercover officer had entered an apartment and actually bought drugs.  He then left to inform other agents of the drug buy, and ten minutes later the officers knocked and announced their presence.  Agents watching the rear of the apartment radioed to the front that the occupants were trying to escape through the back door, so the officers at the front door broke in.  The Second Circuit Court of Appeals noted first that exigent circumstances had existed before the officers knocked, and second that the occupants responded to a lawful knock with an escape attempt, further justifying the entry.  Id. at 771.

In this case, however, exigent circumstances did not arise until the agents announced themselves.  The record indicates that the agents did not know what, if any, evidence Room 214 might contain.  They were looking for Dani Gonzalez.  Their primary fear, they urge then, became that the room's occupants were "setting them

9

up" when the door did not immediately open.  Agents were also posted behind the room, and the occupants did not attempt to flee when the officers announced their presence.

Defendants rely on <u>United States v. Munoz-Guerra</u>, 788 F.2d 295 (5th Cir. 1986).  In that case, officers responding to several tips had placed a residence under surveillance.  After noticing some marihuana in plain view through a window, the officers knocked at the patio door.  One of the occupants motioned through the door that he had to get a key.  Fearing that he was in fact going to get a gun, the officers broke through the door and arrested the occupants.  We held that there was no justification for approaching the suspects without a warrant because the police surveillance was undetected.  Consequently the officers could have secured the "condominium covertly from the outside" and delayed their entry until they obtained a warrant.  Instead, the warrantless entry became a foregone conclusion once officers knocked.  <u>Id</u>. at 298.

The agents had secured Room 214 from the outside, successfully and covertly.  The government nevertheless attempts to distinguish <u>Munoz-Guerra</u> by suggesting that Weir and Da Costa had reason to know of the police surveillance.  The government urges that Weir and Da Costa could have suspected problems when Richard did not return from Gramercy or that they could have been tipped off by one of the numerous phone calls they received.  These conclusions are pure speculation.  No evidence was offered at the suppression

10

hearing to suggest that the room's occupants knew about Richard's arrest, that they were aware they were being watched, or that they were destroying evidence.

The government also asserts that the agents had no time to obtain a warrant. It argues that Agent Mensinger was busy searching the dock area for Gonzalez and then returning to New Orleans. But Mensinger was in radio contact with other officers beginning at approximately 6:30 a.m., and he could have initiated the procurement of a warrant telephonically at least an hour before he departed Gramercy to drive the hour to New Orleans. Additionally, after reaching the Superdome Motor Inn, the officers could have maintained their surveillance until a warrant arrived. If exigent circumstances had arisen while waiting for the warrant, then the agents would have been justified in entering. United States v. Thompson, 700 F.2d 944, 950 (5th Cir. 1983) (quoting Cardwell v. Lewis, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974)).

The government argues that the agents were acting in the midst of a rapidly developing investigation and had to enter Room 214 to prevent the destruction of valuable evidence. No evidence was presented to justify these assertions either. We conclude that the district court did not err when it found that the agents had created exigent circumstances by knocking on the door of Room 214 and identifying themselves.

11

B.  Consent at the Economy Motor Lodge

The government also appeals the district court's suppression of evidence uncovered in the search of Da Costa's Room 241 at the Economy Motor Lodge.  The district court found first that Da Costa's consent to search Room 241 was involuntary because of the coercive police procedures he had endured, and the government does not challenge that initial finding.  The court found next that the consent of Da Costa's girlfriend, Collymore, was involuntary for two reasons:  she had no interest in the items seized in the search, and she consented only because the agents told her Da Costa had.  The government contends that the district court erred here because Collymore's consent was voluntary and cured any taint arising from Da Costa's involuntary consent.

The first question is whether Collymore had the authority to consent to the search of Room 241.  The district court concluded that she did not because she had no interest in the items found in the room.  This finding was clearly erroneous because it was irrelevant once it was decided Collymore was a co-tenant.  A third party can consent to a search if she has "common authority" over the premises.  "Common authority" has been defined as the "mutual use of the property by persons generally having joint access or control for most purposes."  <u>United States v. Matlock</u>, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242 (1974); <u>United States v. Rizk</u>, 842 F.2d 111, 112 (5th Cir. 1988).  In such a situation, "the complaining co-user [has] assumed the risk that

12

the consenting co-user might permit the search." <u>Rizk</u>, 842 F.2d at 112-13. Unless the complaining co-tenant has somehow limited the other's access to a piece of property, the consenting co-tenant's authority extends to all items on the premises. For example, in <u>Rizk</u>, the owner of a briefcase asked Rizk to carry it, but locked it and did not give Rizk the combination. The owner could consent to a search of briefcase, but Rizk could not.

The evidence shows that Collymore had the authority to consent to a search of Room 241 and that her authority extended to the items seized. Both Da Costa and Collymore had been staying in Room 241 for several days. Both had clothes and personal items in the room. No evidence was proffered to suggest that Da Costa had limited Collymore's access to the empty suitcases, trash bags, and dryer sheets. <u>See</u> <u>United States v. Smith</u>, 930 F.2d 1081, 1084-85 (5th Cir. 1991). The district court thus erred in finding that Collymore's consent was defective because she had no interest in the items found in the room.

The second and more difficult question is whether Collymore's consent was valid. A search may be conducted without either probable cause or a warrant if it is conducted pursuant to consent. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44, 36 L.Ed.2d 854 (1973). For consent to be valid, however, the government must prove by a preponderance of the evidence that consent was given freely and voluntarily. <u>United States v. Kelley</u>,

13

981 F.2d 1464, 1470 (5th Cir.), cert. denied, 61 U.S.L.W. 3788 (U.S. May 24, 1993). If the consent to search was preceded by a Fourth Amendment violation, the government bears a heavier burden of proof. United States v. Ruigomez, 702 F.2d 61, 65 (5th Cir. 1983).

Because we accept the district court's finding that Da Costa's consent was involuntary, the analysis of Collymore's consent breaks down into two steps. First, we consider whether her consent was given voluntarily and freely. Second, we examine whether the taint from Da Costa's involuntary consent was dissipated. Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 2261-62, 45 L.Ed.2d 416 (1975); United States v. Pierre, 932 F.2d 377 (5th Cir. 1991), reversed on other grounds, 958 F.2d 1304 (5th Cir.) (en banc), cert. denied sub nom. Harris v. United States, --- U.S. ---, 113 S.Ct. 280, 121 L.Ed.2d 207 (1992).

We consider six factors in evaluating the voluntariness of consent:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

Kelley, 981 F.2d at 1470; see also United States v. Tedford, 875 F.2d 446, 451-52 (5th Cir. 1989) and Ruigomez, 702 F.2d at 64. Although all six factors are relevant, no single one is

14

dispositive.  <u>Brown</u>, 422 U.S. at 603-04, 95 S.Ct. at 2261-62; <u>Kelley</u>, 981 F.2d at 1470.

Agent Roberts, who went to the Economy Motor Lodge, recounted the consent and search:

> So we went up and [the hotel manager] knocked on the door.  A female voice answered from the inside.  I told her that we were U.S. Customs, we need to talk to her.  She opened her door.  And I told her that we had permission to search the room.  She said "Fine.  What's going on?"  And I explained to her that we were conducting an investigation.  She said, "Well, I don't have anything to do with it.  Search the room.  Search anything you want.  I don't have any part of this.  I'm just here with my boyfriend."

> . . .

> [Agent] Escoto and I searched the room.  We found four brand new suitcases, we found, had never been used, we found one -- or trash bag, box of trash bags.  I asked her, Susan, what the trash bags were for.  She said she didn't know, that they were for her boyfriend.  And I found three dryer -- boxes of dryer sheets, and I questioned her about the dryer sheets.  She said she had no idea what they were for, they are for her boyfriend.

Collymore was not in custody when she consented to the search.  The testimony indicates that she was cooperative and that she did not think any evidence would be found that would incriminate her.  When the agents questioned her about the trash bags and dryer sheets, she responded that she did not know what they were for.  Although the testimony suggests that Collymore is of at least average intelligence, there was no evidence concerning her education.  The agents did not tell her she had the right to refuse consent, as they had no need to do since they believed they had Da

15

Costa's consent. The lack of such awareness, however, is not fatal to a finding of voluntariness. United States v. Muniz-Melchor, 894 F.2d 1430, 1440 (5th Cir.), cert. denied, 495 U.S. 923, 110 S.Ct. 1957, 109 L.Ed.2d 319 (1990).

Da Costa argues, however, that the agents used coercive police procedures because they obtained Collymore's consent after telling her that they had Da Costa's permission. Consent is invalid if it is coerced, either explicitly or implicitly. Schneckloth v. Bustamonte, 412 U.S. 218, 228, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). Coercion is clearly a factor if consent is "granted *only* in submission to a claim of lawful authority." Id. at 233, 93 S.Ct. at 2051 (emphasis added); United States v. Gomez-Diaz, 712 F.2d 949, 951 (5th Cir. 1983), cert. denied, 464 U.S. 1051, 104 S.Ct. 731, 79 L.Ed.2d 191 (1984).

At the same time, "[t]he touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, --- U.S. ---, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). The Fourth Amendment protects against unreasonable searches, not against incorrect ones. The Supreme Court has recognized that warrants issued on "seemingly reliable but factually inaccurate information" pass Fourth Amendment muster. Illinois v. Rodriquez, 497 U.S. 177, 183-86, 110 S.Ct. 2793, 2799-2800, 111 L.Ed.2d 148 (1990).

16

Defendant Da Costa relies on Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). In Bumper, the defendant successfully obtained suppression as evidence of a rifle found in a search of his home. Police had approached the home where the defendant lived with his grandmother. The officers told the grandmother that they had a search warrant, and she invited them to search the house although she never saw the warrant. The Supreme Court refused to allow the officers to rely on her consent instead of the warrant, later challenged as defective, in the absence of any other evidence of voluntariness. Id. at 548-50, 88 S.Ct. at 1792. Bumper, however, is not controlling authority in the instant case.

Agents Escoto and Roberts both testified that they were given the key to Room 241 and told that Da Costa had consented to a search. Although the district court found Da Costa's consent to be invalid as a matter of law, Escoto and Roberts were not present when Da Costa allegedly gave his permission. At the time both agents reasonably believed that they had consent to search Room 241. They did not represent to Collymore that they had a warrant, as did the officers in Bumper. And Collymore did not simply acquiesce quietly and open the door. After hearing of Da Costa's consent, she first asked for an explanation before admitting the agents and inviting them to search the room. The totality of the circumstances compels us to conclude that Collymore's consent was voluntary.

17

The inquiry does not end there, however. Collymore's voluntary consent did not necessarily dissipate the taint of Da Costa's involuntary consent. We apply the three factors set out in Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 2261-62, 45 L.Ed.2d 416 (1975). We consider "(1) the temporal proximity of [the Fourth Amendment violation] and consent, (2) intervening circumstances, and (3) the purpose and flagrancy of the official misconduct." United States v. Kelley, 981 F.2d 1464, 1471 (5th Cir.), cert. denied, 61 U.S.L.W. 3788 (U.S. May 24, 1993). There was a short passage of time between the involuntary consent and Collymore's consent. Da Costa was arrested and allegedly gave his permission to search at approximately 9:30 a.m. The agents testified that they arrived at the Economy Motor Lodge at about 10:00 a.m. Additionally, the two events occurred in different places, and Collymore was not present when the agents entered Room 214 and arrested Weir and Da Costa.

Several factors constituted intervening circumstances. Not only did the two conversations occur in different places, but they also occurred with different people in a different atmosphere. For example, consent did not cure the taint of an improper detention when agents stopped a traveler in an airport, involuntarily confined him in a small room without probable cause, and obtained his consent to search his luggage. Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality). The agents in Royer had requested consent from the detainee during an illegal

18

detention. In this case, agents requested consent from Da Costa's co-tenant, after obtaining his invalid consent in a different location. The atmosphere was also more conducive to an act of free will. In United States v. Mendoza-Salgado, 964 F.2d 993, 1013 (10th Cir. 1992), a woman was present when her husband was arrested. Nevertheless, after a short time had passed and all had calmed down, the wife offered to allow the officers to search the residence. The Tenth Circuit Court of Appeals applied the Brown factors and held that the woman's valid consent had cured the taint of the illegal arrest. The change in atmosphere is more compelling in this case. Collymore did not witness Da Costa's arrest, and she was approached by only two agents.

Finally, there is little evidence of flagrant official misconduct. The agents reasonably believed they had Da Costa's consent. The evidence shows that they approached Collymore truthfully and respectfully. They did not intentionally mislead her in any way. The agents did not barge into Room 241, waving their claim of lawful authority. Instead they answered her questions until she was satisfied and allowed them to enter.

After applying the Brown factors and reviewing the evidence, we hold that Collymore's voluntary consent dissipated taint of the coercive entry that exacted invalid consent from Da Costa. The district court failed to apply the full Brown analysis and erred in finding that Collymore's consent was involuntary. We must reverse

19

the suppression of evidence discovered in the search of Room 241 of the Economy Motor Lodge.

## III. CONCLUSION

We hold that the district court did not clearly err in finding that the agents had created their own exigent circumstances when they knocked at the door of Room 214 of the Superdome Motor Inn. We affirm the suppression of evidence discovered in the search of that room. We hold, however, that the district court did err in finding that Collymore's consent was involuntary, and we reverse the suppression of evidence found in Room 241 of the Economy Motor Lodge.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.