**UNITED STATES of America,**

v.

**Carlos CARBAJAL.**

**No. EP–94–CR–363–DB.**

United States District Court, W.D. Texas, El Paso Division.

March 24, 1995.

Opinion Granting Reconsideration April 18, 1995.

Mark M. Greenberg, El Paso, for plaintiff.

Michael S. McDonald, El Paso, for defendant.

## MEMORANDUM OPINION AND ORDER

BRIONES, District Judge.

On this day, the Court considered the Defendant's Motion to Suppress in the above-captioned cause. The government duly filed its response. After a hearing held on March 8, 1995, the Court is of the opinion that the motion should be resolved as set forth below.

### Statement of Facts

On July 27, 1994, Agent Victor Maldonado (herein "Maldonado") of the El Paso office of Alcohol, Tobacco and Firearms interviewed Carlos Carbajal ("Carbajal" or "Defendant"), a 20 year old El Paso resident, during the course of an on-going investigation of violations of federal firearm laws against one David Jimenez ("Jimenez").[1] Maldonado interviewed Carbajal and his mother at their residence at 7613 Parral in El Paso, Texas, regarding a drive-by shooting in November, 1993 wherein Carbajal was the target and Jimenez was the shooter.[2] Maldonado sought evidence against Mr. Jimenez. Maldonado took a statement from Carbajal and Carbajal's mother. Upon completion, Maldonado wrote the statement out, handed the statement to Carbajal who made corrections, initialed the changes and then signed the statement.

The next day, a confidential informant provided more information on the drive-by to Maldonado. According to this information, shortly after the drive-by, Carbajal retrieved a shotgun from his room and taunted Jimenez to come on the property shortly before the police arrived. Because this was the first time information had been received from this individual, Agent Maldonado did not seek a search warrant based on this information.

---

1. Jimenez is alleged to be a member of a street gang known as the "King Kobras". While Carbajal denies any present involvement with a gang, he does admit to being "corded out" (expelled after a beating by all the members of a gang) from a group known as the "Eastside Mob" prior to the drive-by shooting.

2. On the day of the drive-by, Carbajal had learned that Jimenez sought him. Nevertheless, Carbajal walked home the young grandson of a neighbor as a favor. As Carbajal and the boy neared Carbajal's residence, a friend sitting on his porch called out a warning that Jimenez was following them in a car. Shortly thereafter, Jimenez opened fire on Carbajal, who immediately grabbed the boy and pulled him behind a dump truck parked on the curbside. Carbajal waited for an opportune time, then made a dash for his house some two doors down. Both Carbajal and the young boy successfully gained entry to the Carbajal residence. Police arrived moments later, as neighbors called after the first shot. Carbajal denies owning the shotgun on the day of the shooting.

On the 29th, based on this information, Maldonado returned to the Carbajal house. Before going over to the residence, Maldonado phoned to verify that Carbajal would be home. By his own admission Maldonado was not returning to further investigate the drive-by but to check out the report of the shotgun. Agent Maldonado accompanied by Agent Silas ("Silas") were admitted to the residence by Carbajal's mother who then woke up Carbajal. Carbajal's mother left the meeting to go to the kitchen. Maldonado asked Carbajal if there was a place where they could speak in private. Carbajal took the agents to his bedroom. Carbajal sat on the edge of his bed. Maldonado told Carbajal that he had information that there was a sawed-off shotgun in his room and asked for consent to search the bedroom. Carbajal slammed his hand down on the edge of the bed and remarked "I can't let you take it because I'll be left without protection." The agents then searched the room. The shotgun was concealed under bed approximately under the place on the mattress Carbajal had slammed his hand. The gun was a sawed-off, single barrel, single shot .410 gauge shotgun. The gun was unloaded.

Conveniently, Maldonado had a consent form in his portfolio. Maldonado informed Carbajal that if he did not sign it he, Maldonado, would seek a search warrant. He read this consent form to Carbajal who then signed it. Maldonado then told Carbajal that because he had cooperated he would not be arrested that day; when and if an indictment for possession of an unregistered firearm was returned, as it subsequently was, Carbajal would be given an opportunity to surrender without being arrested in his home. Carbajal did not want his mother to see the gun. Agent Silas carried it out of the house in a pillow case. Carbajal surrendered in late October after being indicted by the Grand Jury.

### Discussion

The question before the Court, in its simplest form, is "Did the statements made by Defendant in his bedroom amount to consent?"

■ The Fourth Amendment analysis is familiar: was there a search that invokes the Fourth Amendment; was the search objectively reasonable: and, if not, should the evidence be excluded as a "fruit of the poisonous tree". Cf. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The touchstone of the Fourth Amendment is reasonableness. *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991), citing *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576. Only those searches which are unreasonable are proscribed by the Fourth Amendment. *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). The Court has held that searches to which consent has been granted are reasonable. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). "The State has the burden of proving that consent was freely and voluntarily given. This burden is not satisfied by a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion). The scope of a search is generally defined by its expressed object, that is, what did the officer request consent to search. *Jimeno*, 500 U.S. at 251, 111 S.Ct. at 1804, citing *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

■ In *United States v. Wilson*, 36 F.3d 1298, 1304 (5th Cir.1994), the Court found no authority which renders a subsequent written consent a dispositive factor in determining whether the search and seizure was within the scope of a pre-seizure consent. It stands to reason that this would hold true in the absence of pre-seizure consent. As noted above, in the case at bar, the Court finds that the gun was seized prior to the written consent. The Court in *United States v. Melendez–Gonzalez*, 727 F.2d 407, 414 (5th Cir. 1984) pointed out, and subsequent research by this Court confirms, that there is no legal authority which justifies an earlier illegal search based upon a later consent to a search.

■ Further, the testimony of Agent Maldonado indicated he was aware that he did not have sufficient evidence to bring before a

magistrate for a warrant as the informant did not have the requisite indicia of reliability. Based on the testimony illicited during hearing, Maldanado's source was erroneous. The Court finds the testimony that Carbajal owned the gun for only three weeks prior to the seizure credible and persuasive. Therefore, the information that he had brandished the weapon at Jimenez in November, 1993, was fictitious. Under the totality of the circumstances, from his statements and from his request that Carbajal sign the consent form, it is obvious to the Court that Maldonado knew he had not received proper consent to search for the weapon.

■ Alternatively, if the statements did amount to consent then there is the possibility that the consent was coerced. In *United States v. Mendenhall*, 446 U.S. 544, 552, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), the Supreme Court held that absent some evidence of offensive interaction between the member of the public and the police there can be no seizure. "The question whether [the defendant's] consent to accompany the agents was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances." *Id.*, 446 U.S. at 557, 100 S.Ct. at 1879. In *Mendenhall*, the Court held no seizure occurred:

> The events took place in a public concourse. The agents wore no uniforms and displayed no weapons. They did not summon respondent to their presence, but instead approached her and identified themselves as federal agents. They requested, but did not demand to see respondent's identification and ticket. Such conduct without more did not amount to an intrusion upon any constitutionally protected interest. *Id.* at 555, 100 S.Ct. at 1877.

The Court went on to point out that the Constitution does not demand that the suspect be informed of the right to refuse consent to the search or seizure although such information does lessen the probability that the officers conduct could reasonably appear coercive. *Id.* at 555–57, 557–59, 100 S.Ct. at 1878, 1879. In the case presently before the Court the interview took place in the Defendant's bedroom. The agents wore plain clothes. They came to the Defendant's home for their interview. They asked if there was some place they could speak in private though no one else was in the room at the time of the request. They accompanied him to his bedroom and proceeded to question him in very close quarters. Carbajal trusted the agents based on their earlier dealings with him. All of these factors, when put together, create a coercive environment. If Defendant's statement was indeed consent, then it was merely submission to lawful authorities; the government does not carry its burden in this regard.

Based on the foregoing, under the totality of the circumstances, the Court finds that the Defendant did not consent to the search or alternatively, that the consent was obtained in a coercive manner.

Accordingly, it is ORDERED that Defendant's Motion to Suppress Evidence be GRANTED.

### MEMORANDUM OPINION AND ORDER ON REHEARING AND RECONSIDERATION

On this day, the Court considered the government's Motion for Reconsideration of Suppression Order, filed March 30, 1995, in the above-captioned cause. The Defendant responded on April 4, 1995. The Court is of the opinion that the Motion for Reconsideration should be granted. However, after a hearing held on April 13, 1995, and after considerable reflection, the Court is of the opinion that the evidence should be suppressed.

### Statement of Facts

For purposes of this opinion and order, the Court adopts the Statement of Facts as set out in the original Memorandum Opinion and Order signed March 24, 1995. The Court does note that the Defendant is slightly over six feet tall and weighs in excess of 300 pounds. At rehearing, no new facts were illicited from witnesses.

### Discussion

The government brings alternative grounds under which Agent Maldonado may have searched the room: (1) for officer safety; and (2) under the exigent circumstances

exception. The Court finds neither of these arguments persuasive.

The Fourth Amendment guarantees the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. Courts have observed that searches and seizures "conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." *Thompson v. Louisiana,* 469 U.S. 17, 19–20, 105 S.Ct. 409, 410–11, 83 L.Ed.2d 246 (1984) (per curiam) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnotes omitted)); *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); see also *United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983).

 One such exception was recognized in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which held that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a patdown search "to determine whether the person is in fact carrying a weapon." 392 U.S. at 24, 88 S.Ct. at 1881. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence...." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). A weapons frisk (or what the Supreme Court refers to as a protective search), which is permissible without a warrant and on the basis of reasonable suspicion only, must be strictly "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Terry, supra,* 392 U.S. at 26, 88 S.Ct. at 1882; see also *Michigan v. Long,* 463 U.S. 1032, 1049, and 1052, n. 16, 103 S.Ct. 3469, 3480–81, and 3482, n. 16, 77 L.Ed.2d 1201 (1983); *Ybarra v. Illinois,* 444 U.S. 85, 93–94, 100 S.Ct. 338, 343–44, 62 L.Ed.2d 238 (1979). If a protective search goes beyond what is nec-essary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed. *Sibron v. New York,* 392 U.S. 40, 65–66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968).

 Another such exception involves exigent circumstances. The Fifth Circuit has enumerated several factors which might be considered by a District Court in determining whether exigent circumstance exist: (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) [the] reasonable belief that the contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of the contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge "that efforts to dispose of [the contraband] and to escape are characteristic behavior of persons engaged in the narcotics traffics." *United States v. Richard,* 994 F.2d 244, 246 (5th Cir.1993); *United States v. Thompson,* 700 F.2d 944, 948 (5th Cir.1983) (citing *United States v. Rubin,* 474 F.2d 262, 268 (3rd Cir.) *cert. denied,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973)).

Of the five factors listed, the reasonable belief that the contraband is about to be removed, and that Carbajal's awareness that the A.T.F. agents were "on his trail", are applicable only as a direct result of the agents' conduct. The possibility of danger to the agents guarding the site of the contraband while a search warrant is sought is, at best, debatable in light of the comprehensive training agents receive and the particular facts of this case. Even if these factors give rise to exigent circumstances, it is clear to this Court that the exigency was manufactured. As the Court in *Richard* notes, "exigent circumstances do not pass Fourth Amendment muster if the officers deliberately create them." *Richard,* 994 F.2d at 248 (citing *United States v. Webster,* 750 F.2d 307, 327 (5th Cir.1984), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985)). In determining whether or not an exigent circumstance has been manufactured, the

Fifth Circuit has distinguished between those cases where "exigent circumstances arise naturally during a delay in obtaining a warrant and those where the officers have deliberately created the exigent circumstance." *Webster,* 750 F.2d at 327.

█ In the case-at-bar, the Court is convinced that the actions of the agents amount to the deliberate creation of circumstances which they believed gave them no choice but to search for and seize the shotgun. No exigency existed when the agents spoke with Carbajal in his living room nor did the agent seem to feel that there was any danger to themselves as they conducted no weapons frisk at that time. The Court finds it extremely disingenuous for the agent to say he was concerned with officer safety when he put himself in that position by asking that the interview be moved, for no apparent reason since they were the only ones present in the living room, to a dangerous location from one of seeming safety. Maldonado and Silas requested that they be led to the very room where the shotgun was alleged to be hidden. Exigent circumstance means just that, that is, a situation which was relatively unforeseen and unavoidable which requires an officer or agent to take exceptional action. The agents in the case at bar deliberately put themselves in a situation which, if they believed their confidential informant, they knew to be dangerous. They did not need to move the interview to Carbajal's bedroom to ask him questions: had they not done so, there would not have been even the possibility of exigent circumstances. Simply put, the agents manufactured a situation where there were exigent circumstances and then sought to justify a search and seizure based on this situation.

█ The same holds true for the government's arguments regarding a weapons frisk. As noted above, the purpose of the weapons frisk is to allow the officer to proceed with his investigation without fear of violence *not* to uncover the evidence which the agent sought when he went to the house in the first place. There was not even testimony that the weapon was within reach of the Defendant and moreover there were two experienced agents in very close proximity to the Defendant in a very small bedroom. The Court finds the agent's testimony in this regard to be unpersuasive. This argument, like the exigent circumstance argument seems contrived in light of the actions of the agents.

Based on the foregoing, under the totality of the circumstances, the Court finds that a situation requiring a weapons frisk was contrived by the agents. Further, there were no exigent circumstance which justify a search and if there were such circumstances, these also were contrived or manufactured by the agents. Finally, pursuant to the Court's previous Memorandum Opinion and Order in this case, which the Court adopts in its entirety, the Defendant did not consent to the search or alternatively, that the consent was obtained in a coercive manner.

Accordingly, it is ORDERED that Defendant's Motion to Suppress Evidence be GRANTED.