Filed 11/7/23

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

|  |  |
|---|---|
| JUAN BOITEZ, | C098102 |
| Petitioner, | (Super. Ct. No. CR20222508) |
| v. | |
| THE SUPERIOR COURT OF YOLO COUNTY, | |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate or prohibition.  Tom M. Dyer, Judge. Petition granted.

Tracie Olson, Public Defender, and Aram Davtyan, Deputy Public Defender, for Petitioner.

No appearance for Respondent.

Rob Bonta, Attorney General, Michael P. Farrell, Assistant Attorney General, Ivan P. Marrs and Clara M. Levers, Deputy Attorneys General, for Real Party in Interest.


The Fourth Amendment protects citizens from warrantless searches of their property or person unless the search falls under an established exception to the warrant requirement.  (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219.)  One such exception is a person's consent to a search, which is the focus of this case.  (*Ibid*.)  The prosecution must show by a preponderance of the evidence that a defendant's consent was voluntarily given.  (*People v. James* (1977) 19 Cal.3d 99, 106 & fn. 4.)

"The voluntariness of the consent is in every case 'a question of fact to be determined in the light of all the circumstances.' " (*People v. James*, *supra*, 19 Cal.3d at p. 106.)  As part of the calculus in determining whether a defendant's consent to search was voluntarily given, courts must consider any evidence that a police officer made a misrepresentation that prompted the defendant's acquiescence to the search.  (*U.S. v. Vazquez* (1st Cir. 2013) 724 F.3d 15, 19 (*Vazquez*).)

Petitioner Juan Boitez is a criminal defendant in the underlying case; he filed a motion to suppress the evidence obtained during a search of his mother's car.  After the trial court denied his motion, petitioner filed a petition for writ of mandate or prohibition (petition).  We will refer to petitioner hereafter as defendant.

The question in this case is whether defendant gave voluntary consent for the police to search his mother's car after he was pulled over for a traffic violation.  As a material part of obtaining defendant's consent, the police officer falsely, but apparently with subjective belief that it was true, stated that he had the authority to tow defendant's mother's car, but would not do so if defendant consented to the search.  More precisely, we consider whether, but for the police officer's false promise of leniency as to the towing of defendant's mother's car, the prosecution met its burden by a preponderance of

2

the evidence that defendant's consent was uncoerced.  (*Vazquez*, *supra*, 724 F.3d at p. 18.)

We conclude the prosecution did not meet its burden.  We hold that the false promise of leniency not to tow the car was a material and inextricable part of the agreement inducing defendant's consent to the search, and thus, under the totality of the circumstances, defendant's consent was not voluntarily given.  As part of our analysis, we adopt the reasoning of the First Circuit Court of Appeals that the question of voluntary consent cannot be based on the subjective good faith of a police officer in making the false statement that induced the defendant's consent to search.  (*Vazquez*, *supra*, 724 F.3d at pp. 23-24; cf. *U.S. v. Richard* (5th Cir. 1993) 994 F.2d 244, 251, 252 [consent valid when police officers honestly but inaccurately informed the subject of the search that her boyfriend had already consented to a search of their motel room].)  We issue a peremptory writ of mandate directing the trial court to vacate its order denying the motion to suppress and to enter a new order granting the motion.

FACTUAL AND PROCEDURAL BACKGROUND

The pertinent evidence as to the motion to suppress ruling consists of a video recorded via the body camera worn by City of Winters Police Officer Gordon Brown and Officer Brown's testimony at the hearing.

Defendant was driving his mother's car with a passenger in the front seat at approximately 7:00 p.m. when Officer Brown pulled him over for failing to come to a complete stop at an intersection.  Defendant pulled over in a residential cul-de-sac; the car was partially in the roadway because both right tires were not within 18 inches of the curb, but the car was not impeding traffic.

Officer Brown asked defendant if he had his license, registration, and insurance.  Defendant responded he did not.  Officer Brown then asked whether defendant had a driver's license issued to him; defendant replied he did not and said something

3

unintelligible.  Defendant did, however, have a California identification card, which he provided to Officer Brown.

Officer Brown asked the passenger whether he had an identification card or a driver's license; the passenger replied he did not.  Officer Brown asked both defendant and the passenger whether they were on probation or parole or "anything like that." Defendant replied, "[N]o, not that I know."  Officer Brown followed up by asking whether either of them were "on it recently."  Defendant said he thought he was on formal probation.

Officer Brown asked defendant for his address and told defendant and the passenger to "hang tight."  By that time, approximately three and a half minutes into the stop, another police vehicle was at the scene and Officer Brown asked defendant to turn his car engine off.  As another officer approached him, Officer Brown said, "Bad guys."

Officer Brown transmitted the information provided by defendant and the passenger to his office.  While the officers were waiting for a response, the other officer told Officer Brown that he believed he had seen the car and defendant before and mentioned, "Bad guys."  After a short unintelligible exchange, Officer Brown said, "[T]hey probably have dope on them."

Officer Brown started writing out a ticket and told the other officer, "When somebody tells you they don't know that . . . they're not on parole that they know of, that's kind of a sign that they're probably not doing good stuff."  The other officer asked, "Are they all tatted up?"  Officer Brown replied, "You just get that vibe, you know what I mean?"  After the other officer said something unintelligible, Officer Brown continued, "They're dirty dudes, man."

At approximately seven minutes into the stop the other officer went to the car because he believed defendant was trying to get out of the car.  The other officer returned to Officer Brown approximately 15 seconds later and mentioned defendant wanted to eat food.  The other officer also mentioned that he saw a blue bandana, to which Officer

4

Brown responded, "These are bad guys dude. I . . . know exactly what you're talking about. I grew up with bad guys; these are fucking bad guys." During their continued conversation, Officer Brown told the other officer, "I need you to be ready for these guys." Approximately one and a half minutes later, Officer Brown looked at his computer and said, "Gang member, yeah."

Officer Brown told the other officer he believed the passenger had a valid identification card or driver's license, but said he suspected the passenger was also a gang member. Although Officer Brown said he found defendant to be respectful, he added, "[T]hey're just bad guys, dude." Officer Brown then told the other officer that he had a plan depending on how defendant reacted, which included to have the passenger drive the car. Officer Brown was clear that his plan depended on his conversation with defendant.

Officer Brown told the other officer he wanted "to pull them out" and search the car but he wondered whether defendant would let him do that. The other officer responded they could remove defendant and the passenger from the car while Officer Brown wrote the citation and "just say, you know, for safety." The two police officers decided that Officer Brown would ask defendant to step out of the car first.

Approximately 14 minutes into the stop, Officer Brown walked up to the driver's side of the car and the other officer walked up to the passenger's side of the car. Officer Brown asked defendant to get out of the car and to sit on the bumper of his police vehicle. Officer Brown asked defendant what he and his passenger were doing in town, to which defendant responded they were getting food and his sister lived close by. Defendant said they were not "coming for no [*sic*] trouble." When defendant's phone rang, he apologized and told Officer Brown his sister was calling. Officer Brown said, "If you'll be cool with me, I'll be cool with you." Defendant responded, "[Y]eah."

Officer Brown asked defendant whether he was "still banging." Defendant replied he was not. When Officer Brown asked defendant about the "blue rag" in his hands, defendant said that he uses it for work. Officer Brown asked defendant whether he was a

5

Sureño member and defendant replied, "Yeah," but that he was "just doing [his] own thing" and he no longer represented the gang. When Officer Brown asked whether defendant had a family, he said he did.

Officer Brown reiterated that defendant had a suspended license and said it looked like the passenger "maybe has a license." Defendant replied the passenger did not have a license. At that point defendant's sister walked up and Officer Brown told her to stay back because he was "dealing with" defendant. He added, "You can stand back over there, you can come over here in a little bit. Okay? You have a license?" Defendant's sister confirmed she had a license and moved out of the video frame. The video shows the other officer was still standing at the passenger's side of the car during this exchange.

Officer Brown turned his attention back to defendant and said, "So, I could tow your car right now, but I won't do that, okay? I didn't see any insurance paperwork." Defendant responded he was "pretty sure" the insurance paperwork was somewhere in the car because it was his mother's car. Officer Brown continued, "I'm trying to cut you a little bit of a break, so do you mind if we search your car? You don't have nothing in there? There's no guns, drugs, anything like that? Nothing, nothing bad?" Officer Brown did not wait for defendant to answer the consent to search question before he asked the second question. Defendant looked down when Officer Brown asked whether he could search the car and shook his head side to side when Officer Brown asked the second question; he then looked back up at Officer Brown. Officer Brown asked defendant to have a seat, seemingly pointing to the curb, and said he was first going to give defendant a ticket for driving with a suspended license. Defendant sighed and looked upset. Officer Brown responded, "Look, I'm not giving you a ticket for running the stop sign, I'm not giving you a ticket for the insurance stuff, and I'm not towing your car. That seems like a pretty good deal." Defendant looked down and nodded.

Officer Brown continued, "If I tow your car, brother, you ain't getting it back till Monday. That's . . . the tow plus two days of storage, maybe three . . . ." Defendant

6

continued to look down while nodding his head and then said, "Alright," and asked whether his sister could take the car. Officer Brown replied, "That's what I'm trying to work out with you, man. You be cool with me brother; I'll be cool with you." Defendant again nodded his head and said, "Yeah." Officer Brown asked defendant whether he was "good with that" and, while defendant was nodding, asked, "Is that fair?" Defendant responded, "Yeah." While defendant continued nodding his head, Officer Brown added, "I tell you, I think it's a pretty good deal, man. . . . [T]he no insurance thing, you didn't show me insurance. And sure, maybe it's in there or not, but that's like a thousand dollar ticket, dude." Defendant replied, "Yeah." Defendant then crossed his arms, sighed, and looked down. Officer Brown said, "So, I'm trying to cut you a break, dude, okay? So if you're good with that, I'll cut you a break?" Defendant replied, "Yup," while nodding his head.

Officer Brown asked defendant what his license was suspended for, and defendant replied, "DUI," and showed Officer Brown an alcohol detection ankle monitor. Defendant said he had "no idea" whether he was on court probation. Officer Brown told defendant to sit on the curb and turned to a third officer at the scene and told him about the ankle monitor. Officer Brown directed the officer standing at the passenger's side of defendant's car to get the passenger out of the car and to have him sit on the curb as well. The passenger complied and sat on the curb.

Officer Brown then told the officer who stood at the passenger's side of defendant's car to search the car. The officer found a loaded gun under the passenger's seat. When the passenger was searched, the officers also found a loaded gun on his person.

Defendant is charged with being a felon in possession of a firearm, being a felon in possession of ammunition, unlawfully carrying a loaded firearm, carrying a loaded firearm in a vehicle, and driving with a suspended license. Defendant filed a motion to suppress the evidence obtained during the search of his car.

7

At the motion to suppress hearing, Officer Brown confirmed he did not believe that defendant was on searchable probation and testified the City of Winters Police Department directed its officers "to tow vehicles with drivers on a suspended license" unless the officer used his, her, or their discretion not to do so. If, however, the officer decided not to tow the vehicle, the officer "would have to answer why." After testifying that defendant's mother's car was ultimately towed because defendant had a suspended license, Officer Brown was asked why the car was towed given the agreement he had made with defendant. Officer Brown replied: "What had happened is [*sic*] I actually talked to the sergeant prior to leaving the scene. And, because I had spoken to [defendant] about it, he's like, [h]ey. Can you just release the car to my sister? I said, you know, you're right. Let me ask the sergeant. And I asked Sergeant Ramos, [a]re you okay because I did tell this guy I was going to cut him a break? And he said, no, it's getting towed."

In its ruling on the motion to suppress, the trial court explained it understood the issue to be one of "purely consent." The trial court agreed with defendant that, had the car been towed and had the evidence been discovered during an inventory search, the search "likely" would not have been "justified purely under the community caretaking function." The trial court added, however, the question whether an inventory search would have been legal "is kind of a side point" and "putting the cart before the horse." The trial court found Officer Brown made an offer and defendant in response provided consent to search the car. The trial court thus denied the motion to suppress.

Defendant filed the petition challenging the trial court's ruling. After reviewing defendant's petition, this court issued a request for the People to file an opposition addressing the merits of the petition and "whether the instant matter may be reviewed on the merits, considering [defendant's] motion pursuant to Penal Code section 995 was filed in the superior court more than 60 days following arraignment on the information. (See Pen. Code, § 1510.)" The People filed an opposition as requested, whereafter this

8

court issued an alternative writ to the trial court to grant the relief requested in the petition and to indicate that the court had done so, or to show cause in writing as to why it had not done so and why the relief requested should not be granted. The People, as the real party in interest, filed a return, asserting this court should discharge the alternative writ and deny the petition. We now address the merits.

## DISCUSSION[1]

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

Defendant argues his consent to search the car was involuntary because his consent was acquired through the threat of unlawful police action, i.e., Officer Brown's false statement that he had authority to tow the car. He further argues the totality of the circumstances indicates his consent was not freely and voluntarily given. The People concede Officer Brown did not have authority to tow the car but argue the totality of the circumstances nonetheless "allow[s] a finding of voluntary consent."

---

[1] The People argue defendant has not demonstrated that he is entitled to pretrial review of his suppression motion because he filed the motion more than 60 days after his arraignment and failed to establish that the unawareness exception under Penal Code section 1510 applies. (§ 1510 [a motion to suppress "may be reviewed prior to trial only if the motion was made by the defendant in the trial court not later than . . . 60 days following defendant's arraignment on the information or indictment if a felony, unless within these time limits the defendant was unaware of the issue or had no opportunity to raise the issue"].) This court issued an alternative writ finding defendant had made a prima facie case for relief after the parties briefed the timing issue, which reflected our determination to hear the case on the merits. (See *People v. Romero* (1994) 8 Cal.4th 728, 742-743.) Moreover, there would be no prejudice to the prosecution in deciding the issue prior to trial and defendant's counsel declared he was previously unaware of the issue.

9

We accept the People's concession that Officer Brown did not have authority to tow the vehicle because " '[t]he decision to impound [a] vehicle must be justified by a community caretaking function "other than suspicion of evidence of criminal activity." ' " (*Blakes v. Superior Court* (2021) 72 Cal.App.5th 904, 913.) As the People acknowledge, the vehicle "was parked in a quiet . . . residential neighborhood," it "did not block traffic or create a driving hazard," no one "expressed a concern of vandalism or theft," "a licensed driver was on [the] scene and available to take control of the vehicle at [defendant's] request," and "Officer Brown himself felt no need to tow the vehicle." Thus, there was no community caretaking function that necessitated or authorized the towing of defendant's mother's car.

Before we delve into the question regarding defendant's voluntariness in consenting to the search, we address whether Officer Brown's honest but mistaken belief that he could tow the car impacts our analysis. We conclude it does not.

We adopt the reasoning of the First Circuit Court of Appeals that the question of voluntary consent cannot be based on the subjective good faith of an officer in making a representation that induced the consent to search. (*Vazquez*, *supra*, 724 F.3d at pp. 23-24; cf. *U.S. v. Richard*, *supra*, 994 F.2d at pp. 251, 252 [consent valid when police officers honestly but inaccurately informed the suspect of the search that her boyfriend had already agreed to allow them to search their motel room].) "If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." (*Beck v. Ohio* (1964) 379 U.S. 89, 97.) Thus, "whether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of [a defendant's] election to abandon his[, her, or their] rights." (*Moran v. Burbine* (1986) 475 U.S. 412, 423.) Moreover, "[p]olice officers are presumed to know the law, particularly those laws that relate to the performance of their duties." (*People v. Rosas* (2020) 50 Cal.App.5th 17, 25.)

10

We apply our independent judgment in assessing whether defendant's consent was voluntarily given because there is no dispute as to the facts. The trial court disregarded Officer Brown's false statement that he could tow the car as "a side point" and "putting the cart before the horse" and, without assessing the pertinence of that fact, found Officer Brown made an offer and defendant in response consented to the search of the car. We independently find Officer Brown's false promise of leniency with regard to the towing of the car was a material and inextricable part of the agreement to consent to the search and conclude the totality of the circumstances shows defendant's consent was thus not voluntarily given. We note, the question is not whether the totality of the circumstances *allows* a finding of voluntary consent, as the People assert; the question is instead whether the prosecution met its *burden of showing by a preponderance of the evidence* that defendant's consent was voluntary *but for* the false promise of leniency that Officer Brown would not tow the car. (*People v. James*, *supra*, 19 Cal.3d at p. 106 & fn. 4.) The answer to that question is, "no."

Courts have identified many factors that may be relevant to the inquiry whether a defendant's consent to search was voluntarily given, including: (1) whether the consenting person was in custody and whether *Miranda*[2] warnings were given; (2) whether the officer(s) had weapons drawn; (3) whether the officer(s) informed the person of the right to refuse consent; (4) whether the person was told a search warrant could be obtained; (5) whether consent was obtained while the person was confronted by many officers; (6) whether the consenting person experienced a significant interruption of his, her, or their liberty; and (7) whether the officer(s) used deceptive practices to obtain consent. (See *U.S. v. Cormier* (9th Cir. 2000) 220 F.3d 1103, 1112; *People v. Ledesma* (1987) 43 Cal.3d 171, 233-234; *People v. Avalos* (1996) 47 Cal.App.4th 1569, 1578.) Of

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

11

course, however, "no single factor is dispositive of this factually intensive inquiry." (*Avalos*, at p. 1578.) A false promise of leniency by a police officer to a person consenting to a search is, however, an important piece in ascertaining the voluntariness of the consent. (See *U.S. v. Molt* (3d Cir. 1978) 589 F.2d 1247, 1251-1252 [when a defendant's consent "stems directly from misrepresentations by government agents, however innocently made, we deem the consent even more questionable"].)

"[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." (*Schneckloth v. Bustamonte*, *supra*, 412 U.S. at p. 228.) "Coercion is not limited to physical abuse; it may involve 'more subtle forms of psychological persuasion,' " including " 'deception or communication of false information.' " (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 20.) In that regard we have not found any pertinent California cases involving a materially false promise of leniency by a police officer in return for a defendant's consent to search, but we have found instrumental cases in the context of analyzing the voluntariness of a defendant's confession.

As the United States Supreme Court explained, the tests for voluntariness of giving consent to search and voluntariness of giving a confession share a common root; the former is derived from the latter. (See *Schneckloth v. Bustamonte*, *supra*, 412 U.S. at pp. 223-227.) In both instances, voluntariness is measured under the traditional definition of voluntariness (*id*. at p. 229), which examines the totality of the circumstances (*id*. at p. 227). Although the general analytical factors differ in the search and confession contexts, likely due to the nature of the rights involved and the contextual differences of the circumstances in which those rights are applied, a common factor in both inquiries is that "account must be taken of subtly coercive police questions." (*Id*. at p. 229.)

12

In confession cases, our Supreme Court has said that, " '[w]hile the use of deception or communication of false information to a suspect does not alone render a resulting statement involuntary [citation], such deception is a factor [that] weighs against a finding of voluntariness.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 934.) Our Supreme Court has further said: "When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, [courts] can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful [statement], such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear." (*People v. Hill* (1967) 66 Cal.2d 536, 549.)

The People assert defendant's consent was voluntary because Officer Brown spoke to defendant individually and was polite when he asked defendant during the daylight hours whether defendant would mind if officers searched the car; defendant "was not under arrest, handcuffed, or at gunpoint"; and defendant and Officer Brown "discussed a more general agreement of mutual cooperation that also included actions that [Officer] Brown did have authority to do, such as foregoing additional citations." We disagree.

Here, there were three uniformed police officers at the scene when defendant's consent was elicited, even though Officer Brown was the only officer speaking to defendant. Although defendant was not under arrest, he was effectively seized for purposes of the Fourth Amendment. (*United States v. Mendenhall* (1980) 446 US 544, 554 [a person is seized when the circumstances amount to a show of official authority such that "a reasonable person would have believed that he was not free to leave"].)

13

Officer Brown was collegial in terms of negotiating an agreement for defendant's acquiescence to the search and presented the request to search as an agreement of leniency. The problem with the People's theory that defendant's consent was voluntarily given is that the communication of false information and the false assertion of leniency as to Officer Brown's authority to tow the car was inextricably bound up with the remaining terms of the agreement that induced defendant's consent.

Indeed, based on our independent review, defendant was predominantly concerned with not having his mother's car towed and impounded. Defendant knew he had a suspended license, and called his sister when he was pulled over for the traffic violation. We can discern no other reason for defendant to call his sister than to have her take the car given the status of his license. Defendant's sister confirmed to Officer Brown that she had a valid driver's license, and when defendant and Officer Brown were discussing the terms of the agreement to search the car, defendant asked whether his sister could take the car. Officer Brown stressed that if he towed the car, defendant (or his mother) would not get the car back for two or perhaps three days, indicating it would cost a lot of money if he towed the car. (See *People v. Valenzuela* (1994) 28 Cal.App.4th 817, 832 ["if any suggestion is made to the suspect that 'it would be unwise or fruitless to resist [a search],' the search cannot stand"].) Even after being arrested defendant again asked Officer Brown whether his sister could take the car. The false promise of leniency that Officer Brown made not to tow the car was thus material and important to defendant. (See *Coalition on Homelessness v. City and County of San Francisco* (2023) 93 Cal.App.5th 928, 946 ["vehicle tows are a significant intrusion on property rights that may seriously impact the lives of the owners"].)

Additionally, when Officer Brown mentioned the lack of insurance paperwork, defendant responded that he was sure the insurance paperwork was in the car "somewhere" because it was his mother's car. While defendant did grimace when Officer Brown mentioned the potential citation for the failure to provide insurance

14

paperwork, we cannot say that a preponderance of the evidence shows that term and Officer Brown's statement that he would not give defendant a citation for running the stop sign in the totality of the circumstances shows defendant's consent was voluntarily given.

Because defendant's consent to the search was invalid, the evidence secured by the prosecution as the fruit of that consent is inadmissible. Accordingly, the trial court should have granted the motion to suppress.

DISPOSITION

Let a peremptory writ of mandate issue directing the respondent superior court to vacate its order denying defendant's motion to suppress and to enter a new order granting the motion.

/s/_____,
ROBIE, Acting P. J.

We concur:

/s/_____
KRAUSE, J.

/s/_____
BOULWARE EURIE, J.

15