UNITED STATES of America,

v.

Michael J. BARTH, Defendant.

No. MO–98–CR–33.

United States District Court,
W.D. Texas,
Midland/Odessa Division.

Sept. 21, 1998.

G. Glenn Roque–Jackson, Assistant U.S. Attorney, Midland, TX, for the government.

H. Thomas Hirsch, E. Jason Leach, Hirsch, Stroder & Hobbs, Odessa, TX, for defendant.

## ORDER GRANTING MOTION TO SUPPRESS EVIDENCE

FURGESON, District Judge.

On this day the Court considered the Motion to Suppress Evidence, filed by Defendant on May 18, 1998. An evidentiary hearing was conducted in connection with this matter on May 22, 1998. After due consideration of the evidence adduced at the hearing and the submissions of the parties, the Court is of the opinion that the Motion should be GRANTED.

## FACTUAL BACKGROUND

Defendant is a certified public accountant who owns his own accounting firm in Odessa, Texas. Prior to his self-employment as an accountant, Defendant served in the military and was an Agent for the U.S. Treasury Department.

On Wednesday, February 18, 1998, Defendant began experiencing problems with his office computer. The computer was working slower than usual and he believed there may have been a virus on it. To fix the problem, Defendant called Ken Kellar, a self-employed computer technician who had done computer work for Defendant in the past. Kellar arrived at Defendant's offices that evening and picked up the hard drive portion of the computer. The hard drive is the large, non-removable mass storage component of a computer or computer network. *See* Midwest Micro Glossary of Terms, <http://www.mwmicro.com/glossary/glossary.clm>. It allows for a computer owner to save files and run programs without the use of floppy disks.

Defendant wanted the hard drive back by the morning so that he could continue his business. Kellar took it home with him and hooked it up to his machinery. Kellar began opening individual files in search of potential viruses. After viewing several files, Kellar came across a "JPEG picture file." He opened the file and observed an image of what appeared to be child pornography. Kellar immediately shut down the hard drive, unhooked it, and began attempts to contact Special Agent Jane Kelly of the Federal Bureau of Investigation (FBI), because at this time he was also a confidential informant for the FBI and SA Kelly was his supervising agent.

Kellar first attempted to contact SA Kelly that evening through her pager. While he waited for her to return his page, Kellar also tried to contact Officer Roy Vic of the Odessa Police Department (OPD). Kellar and Officer Vic were acquainted, as Kellar had provided information to Vic and the OPD in the past. Kellar reached the night desk officer at OPD, who forwarded the message. Officer Vic phoned Kellar and asked him to bring the hard drive into the OPD the following morning.

SA Kelly eventually returned Kellar's page that evening as well. SA Kelly told Kellar to copy all of the files on the hard drive onto disks and that she would have someone pick up the disks in the morning. Kellar told SA Kelly that he was going to take the unit to the OPD and make the copies there, and she "concurred with [his] decision." Following his conversation with SA Kelly, Kellar

opened more files and discovered more images of child pornography.

The next morning SA Kelly spoke with SA Dan Leyman. She informed him that she had a source who had come across some child pornography. SA Kelly relayed that she had asked the source to copy the hard drive. She did not inform SA Leyman that the source was a confidential informant; at this time she was simply asking for his opinion on whether this course of action might pose legal problems.

Kellar, meanwhile, went to the OPD with the hard drive. Officer Vic was out on sick leave, so Kellar asked for Kevin Begley. Captain Begley and Detective Dean McCann took Kellar and the hard drive to an upstairs office in the OPD. The hard drive was hooked up and the officers reviewed the child pornography files that were on it. Kellar presumably informed them that he had spoken with the FBI, because during this time the officers made a copy of the hard drive "pursuant to Agent Kelly's instructions," according to SA Leyman. The officers did not know that Kellar was an FBI confidential informant, though they suspected he might be.

The OPD officers obtained a sworn statement from Kellar in order to obtain an evidentiary search warrant for the hard drive. The basis for the state evidentiary warrant was solely the information provided by Kellar, not what the officers had seen. Although the application for the evidentiary search warrant to state District Judge Lewis, Ector County, Texas, did not include the fact that the officers had viewed files on the hard drive, Kellar's sworn statement did include this information, as well as the fact that it was the officers who actually copied the files pursuant to SA Kelly's request.

While in the process of obtaining an evidentiary search warrant, the OPD officers also tried to contact SA Kelly. SA Leyman talked to the officers when they called the FBI in search of SA Kelly. The officers informed him that they had a hard drive with child pornography on it. SA Leyman was communicating with the officers during this time only because he was trying to assist them in locating SA Kelly.

Kellar's sworn statement for the state warrant does not mention either that Kellar is a FBI confidential informant or that Kellar had given information to the OPD on prior occasions. At the time he made his affidavit, the officers did not know Kellar was a FBI confidential informant and did not regard him as a OPD confidential informant even though he had given information in the past.

Later that day Detective McCann obtained the state evidentiary warrant for the hard drive. Detective McCann contacted Texas Department of Public Safety Special Investigator Richard Dixon to assist in the warrant search. Dixon is a forensic computer analyst; OPD was concerned that they might lose data if they did not conduct the search properly. The officers told Dixon what they knew about the computer, and they also had Kellar speak to Dixon because Kellar had built the system.

SA Kelly came to be informed that the OPD intended to execute a search warrant on the computer on the next day, February 20. A briefing was also scheduled at OPD on February 20. Because she was busy, SA Kelly asked SA Leyman to attend the briefing and to assist the search on behalf of the FBI. SA Leyman still had not been told that Kellar was a confidential informant, though he suspected Kellar might be; SA Kelly continued to refer to him as a "source."

Several detectives were present at the morning briefing. The hard drive was in an interview room. About forty-five minutes after SA Leyman arrived, the officers turned on the hard drive and began looking at and copying files. DPS Investigator Dixon ran a program which allowed SA Leyman to view files as they were being copied. SA Leyman saw firsthand several of the images of child pornography on Defendant's hard drive.

Later in the day, SA Leyman consulted Assistant United States Attorney Glen Jackson regarding the case. AUSA Jackson expressed concern about the investigation to this point, but stated that if Kellar was not a "government actor," then his search was likely to be lawful. Despite this legal opinion, SA Leyman again did not inform AUSA Jackson of his suspicions that Kellar was a

confidential informant and therefore arguably could have been a government actor.

Throughout the day, SA Leyman sought guidance from AUSA Jackson on how to continue the investigation, but he never expressed his concern that Kellar might be a confidential informant. The Court notes that SA Leyman is a highly professional and dedicated law enforcement official, and his failure to mention this concern was not an attempt to deceive AUSA Jackson. To the contrary, SA Leyman testified that he did not express his concern because (1) he felt that Kellar had acted in his own interest; and (2) he was aware that FBI policy, discussed in further detail below, prohibits the disclosure of the names of confidential informants to third parties, including other members of the Justice Department.

AUSA Jackson and SA Leyman worked together to design a plan to search Defendant's home and office. First, SA Leyman drafted applications for two federal search warrants (one for Defendant's home and one for his office), and SA Monica Cardenas signed them for presentation to United States Magistrate Judge Stuart Platt. Both SA Cardenas and SA Leyman suspected that Kellar might be an informant but did not include this information in the application. Again, SA Leyman did not mention this fact because (1) FBI policy prohibited him from disclosing such information, and (2) his belief that Kellar was acting as a private citizen and not as a confidential informant.

The application states:

Kellar needed to review each file to attempt to locate the virus. While reviewing these files, Kellar observed what appeared to be child pornography. Kellar contacted the FBI, who referred him to the OPD. Then Kellar met with Captain Kevin Begley, OPD, regarding these images. Captain Begley assigned Detective (Det.) Dean McCann, OPD to investigate this matter. Kellar brought the computer to OPD, and provided a statement to Det. Troy Joiner, OPD. Kellar also copied the files with child pornography to computer disks and turned the disks and computer over to Det. McCann.

The application does not mention SA Kelly and, in so failing, contains what appears to the Court to be an important omission. Kellar's sworn statement to Detective Joiner, as well as SA Leyman's testimony at the suppression hearing, indicates that Kellar did not copy the files on the hard drive at all; it was done by Detective McCann at the request of the FBI. Yet the application to Magistrate Judge Platt suggests that the FBI was not involved in any of this activity, except to "refer" Kellar to the OPD. Kellar's affidavit also indicates that he went to the OPD on his own initiative, not at the request of the FBI.

Late in the day, SA Cardenas took the application to Magistrate Judge Platt, while SA Leyman went to Defendant's office to get there before the firm closed. As a second part of the plan designed by AUSA Jackson and SA Leyman, the agents were to initially ask for consent to search both the office and residence; however, if consent was not given, then the agents would proceed with the signed search warrants. This part of the plan, first asking for consent, was an effort to address any Fourth Amendment problems that might have been created by prior actions in this case.

Accompanying SA Leyman to Defendant's office were other FBI Agents, OPD officers, and Texas DPS officers. There were between five and ten law enforcement officials present, dressed in street clothes with weapons displayed. The officers spoke to Defendant in a conversational tone and advised him of why they were there. During the conversation they advised Defendant that they had a search warrant. They asked for and received consent from Defendant to search his home and office.

The search of the home revealed no incriminating evidence. However, in Defendant's desk at the office were discovered 71 Polaroid photographs of Hispanic females in various stages of undress and engaging in various kinds of sexual conduct. Additionally, from Defendant's office the officers seized one large floppy disk; eight LS 120 computer disks, each of which can store 120 megabytes of data; 1 computer backup tape; and 4 VHS format videocassette tapes.

Defendant began making statements before the search began and continued to make statements during the search. He was advised that he was not under arrest and that he would not be arrested that evening. Following the search, Defendant went to OPD and gave a recorded statement. The recorded statement began with Defendant being advised that he was being recorded and Officer McCann reading Defendant his *Miranda* rights. This was the first time Defendant was given a *Miranda* warning. Defendant talked about his education; he was a college educated certified public accountant who had served in the Marine Corps and with the Treasury Department prior to opening his own business. After discussing his background, Defendant confessed to downloading child pornography off of the Internet.

The recorder was turned off twice, once to break for Cokes and again at the conclusion of the interview. Defendant asked what would happen to him; the officers told him that the information gathered would be forwarded to the United States Attorney's Office and that there appeared to be criminal violations that carried a maximum sentence of five years. The officers were concerned about Defendant because he gave indications during the interview that he might commit suicide.

On Monday, February 23, SA Leyman and Officer McCann went to the U.S. Attorney's office to discuss the case with AUSA Glen Jackson. An arrest warrant was issued on this day; Defendant was arrested on the evening of February 23 and made his initial appearance before Magistrate Judge Platt on February 24.

A detention hearing before Magistrate Judge Platt was conducted on February 25. Before this hearing, SA Leyman approached AUSA Jackson and for the first time informed him that Kellar was in fact an FBI confidential informant. SA Leyman had spoken to the FBI Informant Coordinator in El Paso, who confirmed Kellar's status as an informant. When he informed AUSA Jackson about Kellar's status as an informant, SA Leyman violated FBI policy prohibiting disclosure of Kellar's status as an informant.

Defendant contends that the searches of the contents of his hard drive and of his office violated his right to be free of unreasonable searches and seizures under the Fourth Amendment.

## DISCUSSION

### I. The Warrantless Searches

The facts of this case present several warrantless and therefore potential Fourth Amendment violations: (1) Kellar's initial discoveries of images of child pornography; (2) the OPD's subsequent viewing of Defendant's hard drive; and (3) SA Kelly's request that the hard drive be copied onto floppy disks.

#### A. *Kellar's Initial Discoveries*

The Fourth Amendment to the Constitution establishes the right of American citizens to be free from unreasonable searches and seizures by the government. *U.S. Const. Amend. 4.* It is well-established that a warrantless search is *per se* unreasonable unless it is justified by an exception to the general rule. *Horton v. California*, 496 U.S. 128, 133, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *United States v. Ross*, 456 U.S. 798, 824–25, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

Private party conduct does not raise Fourth Amendment concerns; only activity by government agents implicates a person's Fourth Amendment rights. *United States v. Paige*, 136 F.3d 1012, 1017 (5th Cir.1998). For a private party search to be classified as government action, (1) the government must know of or acquiesce in the intrusive conduct, and (2) the private party must intend to assist law enforcement in conducting the search. *Id.; see also United States v. Blocker*, 104 F.3d 720, 725 (5th Cir.1997).

In this case, Kellar's initial discovery of an image of child pornography did not violate the Fourth Amendment, because Kellar was not a "government actor" as that term has been defined in the case law. It is true that SA Kelly, after the fact, ratified the

intrusive conduct when she asked Kellar to copy the entire hard drive. However, there is no evidence that Kellar intended to assist law enforcement officers when he initially viewed the image.

■ More troublesome is Kellar's subsequent viewing of other files that evening. Following his conversation with SA Kelly, Kellar opened more files and discovered more incriminating evidence. Kellar, at this point, was not opening private files in an effort to repair the machine; he did so for the purpose of assisting law enforcement officials. An argument can be made that Defendant's Fourth Amendment rights were not violated when Kellar reopened the files, because he did not do so at the request of SA Kelly or with her tacit approval; yet the Court is of the opinion that such an argument ignores the reality of the situation.

After the first call made to SA Kelly, the Government knew that one of their "agents" was in possession of a computer to repair it, not to search it. Clearly, no one could have concluded at this point that any consent had been given to the Government to search the hard drive. The Government had notice of these facts and agreed that the computer was to be was to be taken the next day to OPD. When the Government first got notice (in the person of SA Kelly) of the situation, it must be concluded that all actions of Kellar thereafter are attributable to the Government, who then must be charged with acquiescing to Kellar's intrusive conduct. To draw the line at any later time would give Kellar, untrained in law enforcement and unrestrained by the responsibilities and duties of officers sworn to protect the Constitution, a free reign to violate the protections of the Fourth Amendment while nonetheless working for the Government. Although it is probably a fact that SA Kelly did not expect Kellar to continue his search of the hard drive, her knowledge or expectation cannot change the analysis. Notice to her triggered the acquiescence, at least under the facts of this case.

Even if the Court's view of this unusual fact pattern places too heavy a burden on the Government to supervise Kellar at the outset, subsequent events raise additional Fourth Amendment problems, as the following discussion illustrates.

*B. The OPD's Subsequent Viewing and Copying of the Contents of the Hard Drive*

The Government contends that no Fourth Amendment violation occurred with respect to the OPD's subsequent viewing of the contents of the computer, primarily because: (1) "Defendant did not have a reasonable expectation of privacy in the computer because he allowed Kellar to examine it," and the subsequent viewing did not exceed the scope of the original examination; and (2) the search was based on Kellar's authority to consent to a search of the computer.

*(1) Defendant's Reasonable Expectation of Privacy*

■ Not all invasions of privacy are searches or seizures within the meaning of the Fourth Amendment. *See Soldal v. Cook County, Illinois,* 506 U.S. 56, 68, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). Only activity that "intrudes upon a reasonable expectation of privacy in [ ] a significant way" constitutes a search subject to the Fourth Amendment reasonableness inquiry. *Paige,* 136 F.3d at 1017 (quoting *United States v. York,* 895 F.2d 1026, 1028 (5th Cir.1990)).

■ Although the protection afforded to a person's computer files and hard drive is not well-defined, the Court finds that the Fourth Amendment protection of closed computer files and hard drives is similar to the protection it affords a person's closed containers and closed personal effects. *See, e.g., United States v. Knoll,* 16 F.3d 1313, 1320 (2d Cir.1994) (discussing protection afforded to office files). Outside of automobile searches, a warrant is usually required to search the contents of a closed container, because the owner's expectation of privacy relates to the contents of that container rather than to the container itself. *United States v. Chadwick,* 433 U.S. 1, 10–11, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. Chan,* 830 F.Supp. 531, 534 (N.D.Cal.1993) (analogizing data in a pager to contents of a closed container). By placing data in files in

a storage device such as his hard drive, the Court finds that Defendant manifested a reasonable expectation of privacy in the contents of those files. These files should therefore be afforded the full protection of the warrant requirement.

The Court also finds that Defendant did not lose his reasonable expectation of privacy in his closed, individual files when he gave the hard drive to Kellar. For example, a person's expectation of privacy is not "destroyed by the fact that the lessor or landlord possesses a key and had maintained a limited right to enter the rental premises for repair, inspection, and similar purposes." *United States v. Osunegbu*, 822 F.2d 472, 478 (5th Cir.1987). Defendant gave the hard drive to Kellar for the limited purpose of repairing a problem unrelated to specific files and also expected that he would have the unit back the following morning to continue his business. Defendant, therefore, retained his reasonable expectation of privacy in the files when he gave the hard drive to Kellar.

The government contends that once Kellar opened the image of child pornography, Defendant lost his reasonable expectation of privacy in the files on the hard drive. A private party search can destroy an individual's reasonable expectation of privacy, if the activity or conduct of the defendant "and/or the circumstances of the situation ... significantly lessened the defendant's reasonable expectation of privacy 'by creating a risk of intrusion [by private parties] which [was] reasonably foreseeable.'" *Paige*, 136 F.3d at 1020 (citing *York*, 895 F.2d at 1029). However, this is so only where the subsequent police search is limited in scope to the private party's search. *See United States v. Bomengo*, 580 F.2d 173, 175–76 (5th Cir.1978) (police search subsequent to private citizen search is not violative of Fourth Amendment "so long as the view is confined to the scope and product of the initial search"); *United States v. Jenkins*, 46 F.3d 447, 457 (5th Cir.1995).

In the present case, SA Leyman testified that Kellar discovered "an image of child pornography" and immediately unhooked the hard drive and turned it off. After speaking to SA Kelly, he then viewed several other files. It appears clear to the Court that the law enforcement officials in this case did not limit their search of Defendant's hard drive to the viewing by Kellar, especially if this Court is correct that Kellar should have never gone back into the files after talking to SA Kelly. Later, Kellar copied the entire contents of the hard drive onto disks, and this was actually done in the presence and with the approval of OPD officers. The OPD officers also hooked up the hard drive "and then reviewed the files." The line of cases following *Bomengo*, including *Paige*, only apply where a subsequent police search does not exceed the scope of the prior private party search. Because the subsequent search in this case far exceeded Kellar's viewings, Defendant's Fourth Amendment rights were implicated during the OPD's subsequent viewing of his hard drive. *See, e.g., Walter v. United States*, 447 U.S. 649, 658–59, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) (suppression of evidence warranted where third party observed film boxes and FBI subsequently viewed the films without a warrant).

For these reasons, the Court finds that Defendant had a reasonable expectation of privacy in his computer hard drive, such that any viewing of its contents by law enforcement officers would constitute a "search" within the meaning of the Fourth Amendment. The Court also finds that the OPD officers' viewing and copying of its entire contents exceeded the scope of Kellar's initial searches.

*(2) Kellar's Authority to Consent to a Search of the Hard Drive*

As mentioned earlier, warrantless searches of a person's home and personal effects are presumptively unreasonable absent consent or exigent circumstances. *See California v. Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *United States v. Villarreal*, 963 F.2d 770, 773 (5th Cir.1992). The Government contends that the warrantless search of Defendant's hard drive was

lawful owing to Kellar's authority, actual or apparent, to consent to a search of the unit.

In the seminal case of *United States v. Matlock*, the Supreme Court defined the authority of a third party to consent to a search of a dwelling or item. In a footnote, the Supreme Court stated that "the authority which justifies the third party consent does not rest upon the law of property ... but rests rather on the mutual use of the property by persons generally having *joint access or control for most purposes*, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1970) (emphasis added); *United States v. Jenkins*, 46 F.3d 447, 455 (5th Cir.1995). The Government bears the burden to show that Kellar had authority to consent to the search. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

Under the *Matlock* definition, it is clear that Kellar did not have actual authority to consent to a search of Defendant's hard drive. Kellar was in possession of the unit for the limited purpose of repair; it was expected that he would return it by the following morning. Kellar did not have general "joint access" to the hard drive for most purposes, and therefore it cannot be said that Defendant assumed the risk that Kellar was in joint possession of the hard drive such that he could permit a search of it by law enforcement.

■ OPD could not have reasonably believed that Kellar had apparent authority to consent to a search of the hard drive, either. *See Jenkins*, 46 F.3d at 455 (in dicta, finding that apparent authority is sufficient grounds for the government to show consent). Both the FBI and the OPD were aware of who Kellar was. SA Kelly knew Kellar as a confidential informant, and the OPD knew Kellar as someone who had provided useful information in the past. Both, therefore, must have been aware of Kellar's status as a

computer technician, and both were aware of how Kellar came into possession of the hard drive, that he had possession for the limited purpose of repairing it. Therefore, neither the FBI nor the OPD could have reasonably believed that Kellar had common authority to consent to a search of the hard drive.

■ The state judge's signing of an evidentiary warrant based solely on Kellar's affidavit clearly indicates that the officers had probable cause to obtain a warrant to search the hard drive. However, "no amount of probable cause can justify a warrantless search or seizure absent exigent circumstances." *Villarreal*, 963 F.2d at 777 (citing *Horton*, 496 U.S. at 137 n. 7, 110 S.Ct. 2301, and *Taylor v. United States*, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932)). No exceptions apply to this case. Therefore, for the reasons stated above, the Court finds that the warrantless viewing and copying of the contents of the hard drive violated Defendant's Fourth Amendment right to be free from unreasonable searches and seizures.

## II. The Taint of the Illegal Search

"In addition to evidence obtained directly from a violation of the Fourth Amendment, the 'fruit' of such illegal conduct must be excluded.... [T]he inquiry is whether the challenged evidence was obtained by exploitation of that illegality or instead by a means sufficiently distinguishable to be purged of the primary taint." *United States v. Wilson*, 36 F.3d 1298, 1306 (5th Cir.1994) (citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). The Government contends that the evidence obtained in this case should not be suppressed for a number of reasons: (1) the third search of the computer by DPS Investigator Dixon was based upon a valid warrant supported by probable cause; (2) the "inevitable discovery" doctrine applies to the search of the computer and office; (3) Defendant voluntarily consented to a search of his office; and (4) the good faith exception should apply.

### A. The Warrant Searches of the Hard Drive and the Office[1]

■ In this case, the Court finds that the warrant searches of the hard drive and office

---

1. The warrant search of Defendant's residence

yielded no incriminating evidence. Its propriety

were tainted by the original unlawful search. The Supreme Court and the Fifth Circuit have held that "evidence obtained pursuant to an independently obtained search warrant is admissible despite the fact that the evidence has been observed in plain view after an unlawful entry." *United States v. Register,* 931 F.2d 308, 311 (5th Cir.1991). This doctrine, known as the independent source doctrine, requires the Court to examine "whether the search pursuant to warrant was in fact a genuinely independent source of information and tangible evidence." *Murray v. United States,* 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

The independent source doctrine does not apply to this case. The evidentiary search warrant for the hard drive, to be sure, was not tainted by the OPD officers' initial search because the state district judge was not informed of the search. However, DPS Investigator Dixon spoke to both Kellar and the OPD officers before he conducted the warrant search. SA Leyman testified at the suppression hearing that Dixon "obtained as much information as he could from the Odessa Police Department" and then spoke to Kellar because Kellar had built the system, before he conducted his search pursuant the state evidentiary warrant. Because Dixon was aware of and used the information obtained by the OPD in their initial unlawful search, Dixon's search pursuant to warrant was not a "genuinely independent source of information and evidence." As such, the independent source doctrine cannot apply to the warrant search of the computer, and the evidence obtained by the warrant search was tainted by the initial unlawful search.

■ The federal warrant to search the office was based on the evidence discovered on the hard drive. The Court finds, therefore, that the independent source doctrine does not apply to the warrant obtained to search the office, nor does it apply to the evidence obtained during the search of the office.

### B. The Inevitable Discovery Doctrine

■ A corollary to the independent source doctrine is the doctrine of "inevitable discovery." The inevitable discovery doctrine applies when law enforcement abandons a substantial, alternative, and lawful investigative channel once evidence has been discovered. *United States v. Kirk,* 111 F.3d 390, 392 (5th Cir.1997). The doctrine applies because the policy behind the exclusionary rule, to deter unlawful conduct, does not carry as much force when officers were likely to have discovered the evidence absent the illegal conduct. *See, e.g., Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

The inquiry under the inevitable discovery doctrine is not whether the police could have lawfully obtained evidence but simply failed to do so; the inquiry is whether "the tainted evidence would be admissible if in fact discovered through an independent source." *Id.* The inevitable discovery doctrine does not apply to this case because the Government has not shown an independent investigative channel that would have yielded the evidence obtained against Defendant.

### C. Defendant's Consent to Search the Office

"[V]oluntary consent can validate a search even when the search is preceded by a Fourth Amendment violation." *United States v. Kelley,* 981 F.2d 1464, 1470 (5th Cir.1993). Because Defendant's consent to search was preceded by a Fourth Amendment violation, the Court undertakes a two-step analysis: first, whether the consent was given voluntarily, and second, whether the taint from the earlier violation was dissipated. *United States v. Richard,* 994 F.2d 244, 250 (5th Cir.1993).

#### (1) Indicia of Voluntariness

■ The Fifth Circuit has articulated six factors, none of which are dispositive, to consider in evaluating the voluntariness of consent: "(1) the voluntariness of Defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and

is therefore moot.

intelligence; (6) the defendant's belief that no incriminating evidence will be found." *Id.* at 251; *Kelley,* 981 F.2d at 1470.

■ At the outset, when these factors are applied to the record in this case, the voluntariness inquiry appears to be close call. Defendant is a man of above-average intelligence who once worked for the Treasury Department; it can be reasonably assumed that he was aware of his constitutional rights. He was not in custody at the time he gave his consent, and SA Leyman testified that he was extremely cooperative during the search of his office. Without more, these facts alone would usually support a finding of voluntariness.

However, the additional fact that Defendant was told that a search warrant had already been issued requires the Court to determine whether Defendant gave free and voluntary consent, or if he was simply "acquiesc[ing] to a claim of lawful authority." *Bumper v. North Carolina,* 391 U.S. 543, 549, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). In *Bumper,* a woman consented to a search of her home after being told by law enforcement officials that they had already obtained a search warrant. The search yielded incriminating evidence against her grandson. The woman was extremely cooperative, did not know what sort of evidence the officers were searching for, and was not even aware that her grandson was a suspect of any crime at the time the officers arrived.

The Court notes that the facts of *Bumper* had a greater indicia of voluntariness than the facts of Defendant's case. Nevertheless, the Supreme Court held that the Government could not rely on the woman's consent as the basis for the search. "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is [indistinguishable from] coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." *Bumper,* 391 U.S. at 543, 88 S.Ct. 1788.

That Defendant has above-average intelligence, that he was not in custody, and that he was extremely cooperative certainly weigh in favor of voluntariness; yet these facts must be balanced against his awareness that he did not have a meaningful right to refuse to consent as well as the "colorably lawful coercion" associated with the knowledge that the authorities had already procured enough evidence to obtain a warrant. Ultimately, under *Bumper,* the Court is of the opinion that Defendant could not have voluntarily consented to a search of his office owing to his awareness that a search warrant had already issued. Although the conceived plan was to obtain Defendant's consent to search his office and home, and if Defendant declined, to then use the warrant as the basis for the search, this plan was rendered moot when Defendant was informed that a search warrant had already issued. Defendant was aware that his right to refuse consent was meaningless, leaving him with no option but to acquiesce to the claim of lawful authority.

### (2) Taint of the Illegal Search

■ Assuming, arguendo, that Defendant consented to a search of his office, the Court is of the opinion that Defendant's consent could not dissipate the taint from the earlier unlawful search of his hard drive. In assessing whether the taint of an earlier violation has dissipated, the Court considers "(1) the temporal proximity of [the Fourth Amendment violation] and consent, (2) intervening circumstances, and (3) the purpose and flagrancy of the official misconduct." *Richard,* 994 F.2d at 252 (quoting *Kelley,* 981 F.2d at 1471).

Defendant's consent to search the premises was tainted by the earlier Fourth Amendment violation. At the time he consented, Defendant was aware that a warrant had already issued, based on incriminating evidence discovered on his hard drive. Even if acquiescence to lawful authority was not the *sole* factor for his decision to consent, the Court finds that the fact that authorities already possessed incriminating evidence was, at a minimum, a contributing factor to Defendant's consent and cooperation. Therefore, the consent, in these circumstances, could not cure the Fourth Amendment violation.

The Court notes that an important intervening circumstance occurred between the time of the violation and the subsequent search of Defendant's office. SA Leyman solicited the opinion of the United States Attorney's office to get an objective opinion on the propriety of the investigation to that point. Thereafter, SA Leyman kept in regular contact with AUSA Jackson, and ultimately sought the detached and neutral opinion of Magistrate Judge Platt before executing a search of Defendant's office.

The Court lauds SA Leyman for his decision in this difficult case to seek the advice of others with more intimate knowledge of what the law requires of law enforcement officials. It was the right and proper thing to do. However, the Court simply cannot condone the warrant search of Defendant's office under these circumstances, primarily because of the FBI policy limiting SA Leyman's ability to make full and accurate disclosures to AUSA Jackson. At least in this instance, the fact that Kellar's status as a confidential informant was not ultimately determinative does not alter the Court's concern. The FBI policy defeats the very purpose of putting the course of an investigation in the hands of a U.S. Attorney or a detached and neutral magistrate, because these individuals have a greater knowledge of the law's mandates and of the limitations on the conduct of law enforcement officials. *Chadwick*, 433 U.S. at 15–16, 97 S.Ct. 2476; *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). The FBI policy at issue here forces individual agents, good and decent men and women carefully screened for good character and thoroughly trained, to make a very difficult choice: violate the policy or fail to mention arguably relevant information to officers of the court. While SA Leyman ultimately did the right and proper thing in this case, he did so at a time that could not change the course of the investigation. The intervening circumstance of seeking guidance from a prosecutor on how to further proceed in the investigation cannot cure a Fourth Amendment violation when the officer seeking guidance is unable to make full and frank disclosures to the prosecutor.

The Court's concern about the intervening circumstances in this case is connected to the third consideration, the purpose and flagrancy of the misconduct. The Fourth Amendment problem arose in this case because of communications between SA Kelly and her confidential informant, Kellar. In an effort to conceal Kellar's status as a confidential informant pursuant to FBI policy, complete and necessary information about the FBI's involvement in this case was not given to both AUSA Jackson and Magistrate Judge Platt. While this failure was not exculpatory and therefore does not raise a *Franks* issue, *see Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the FBI policy underlying this failure is of sufficient concern that the Court concludes that the taint of the Fourth Amendment violation did not dissipate upon the procuring of the warrant or Defendant's consent to search his office.

### D. Defendant's Oral and Recorded Statements

Although Defendant was not given his *Miranda* warnings prior to making oral statements during the search of his office, the Court is of the opinion that this failure did not implicate his Fifth Amendment rights.

■ "*Miranda* warnings must be given prior to a custodial interrogation." *United States v. Crawford*, 52 F.3d 1303, 1307 (5th Cir.1995). "A person is in custody for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Pofahl*, 990 F.2d 1456, 1487 (5th Cir.1993).

■ No Fifth Amendment violation occurred with respect to the oral statements made by Defendant. When the officers arrived at his office, Defendant was advised that he was not under arrest and would not be arrested that evening. The tone was conversational and Defendant was extremely cooperative. The Court concludes that a reasonable person in the Defendant's position

would not have considered himself the subject of a custodial interrogation.

 Whether a Fifth Amendment violation occurred with respect to Defendant's oral and written statements also depends on whether Defendant made the statements voluntarily. "A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice." *United States v. Broussard,* 80 F.3d 1025, 1033 (5th Cir.1996). Assessing the totality of the circumstances, the Court finds that Defendant's oral and written statements were all voluntary.

"[E]ven if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains." *Brown v. Illinois,* 422 U.S. 590, 601–02, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Considering temporal proximity, intervening circumstances, and purpose and flagrancy of the official actions, the Court finds for the reasons stated in its prior discussion that the taint of the prior Fourth Amendment violation had not dissipated at the time Defendant made his oral and recorded statements. As such, Defendant's oral and written statements should be suppressed.

### E. The 'Good Faith' Exception

 The Supreme Court has held that the exclusionary rule does not apply in every case where police officers commit a violation of the Fourth Amendment. *U.S. v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Rather, the rule should apply where suppression of the evidence obtained will deter unconstitutional police activity. *Leon,* 468 U.S. at 920, 104 S.Ct. 3405. For the reasons stated above, particularly the Court's concern about condoning an FBI policy that prohibits full and frank disclosures even to other members of the Justice Department, the Court concludes that the *Leon* good faith exception should not apply to this case.

### III. Conclusion

Under the circumstances, all evidence seized from the search of Defendant's computer hard drive and from the search of his office is suppressed. The Motion to Suppress in regard to each search and seizure is therefore **GRANTED**.

### IV. Postscript

This appears to be an unusual case where an FBI policy, prohibiting any disclosure of a confidential informant such as Kellar to anyone outside the Bureau, caused a conflict with an FBI Agent's duty to be truthful with a United States Attorney and a United States Magistrate Judge. The Court understands, of course, the need to protect the identity of confidential informants. We live in a dangerous world, even within the confines of our own country. Crime threatens our freedoms, our security, and our safety. Law enforcement needs legitimate tools to combat this serious threat and confidential informants are one such tool. Because of the hazardous nature of their work, confidential informants deserve every reasonable protection. The FBI's policy of non-disclosure for informants like Kellar is thus necessary, to a point.

Still, as the Court has come to understand this particular policy of non-disclosure, it is so rigid that it prohibits an FBI agent from revealing an informant's identity to a prosecutor in a United States Attorney's office, even in a situation where disclosure is absolutely necessary. Under the circumstances, the Court is concerned that the policy is too rigid and can place able, thoughtful, and honorable men and women in the service of our country, like SA Leyman and SA Kelly, in an untenable position, exactly as happened here. The policy further complicates the efforts of honorable prosecutors, like AUSA Jackson, in their efforts not only to prosecute crime but also to ensure that Constitutional mandates are followed and that justice is done for all parties involved. In this case, because SA Leyman is a person of strong character,[2] he made the appropriate disclosures to AUSA Jackson and the full truth of the matter was thereby revealed. The policy

---

**2.** SA Kelly, being of a similar nature, is not mentioned because she was no longer in the case.

put SA Leyman in an untenable position, which should never happen to any agent of the FBI. In light of this problem, the Court urges the FBI to review its policy on confidential informants like Kellar, in connection with circumstances similar to this case.