OPINION OF THE COURT
Victor M. Ort, J.
Pursuant to an order of the Honorable Donald P. DeRiggi dated April 3, 2002, a hearing was held on defendant’s motion to suppress statements, identification testimony, and physical evidence. The matter was referred to the undersigned for said *596 hearing which was held on May 9, October 23, 29, 30, November 12 and 13, 2002. Defendant’s memorandum of law was submitted on January 8, 2003, and the People’s supplemental memorandum of law was received on January 13, 2003. For the reasons which follow, defendant’s motion to suppress statements is granted in part and denied in part, and defendant’s motion to suppress identification testimony is in all respects denied. Defendant’s motion to suppress physical evidence, which is also granted in part, raises the novel issue in this state of whether a warrant authorizing a search of the text files of a computer for documentary evidence pertaining to a specific crime will authorize a search of image files which appear to contain evidence of other criminal activity.
Findings of Fact
In September 2000 Detective Gerard Jetter of the Nassau County Police Department received information from Gary Lenz, an investigator for Cablevision, concerning the sale of illegal cable television access devices.[1] In June 1999 Lenz had seen an advertisement in Popular Mechanics magazine under the cable TV equipment section offering “Jerrold and Pioneer Wireless test units” for sale at $125 each. The ad gave a 24-hour “hotline” phone number of (516) 389-3536. According to the records of TSR Wireless, this telephone line was listed to a Ken Erny, whose address was 108-11 Liberty Avenue, Richmond Hill. Cablevision’s own records indicated that the telephone line was listed to Cablevision customer Peter Dou-nis, whose address was 35 Stowe Place, Hempstead.
On June 14, 1999 Lenz called the telephone number given in the ad and spoke with a person who identified himself as “Charlie.” Charlie told Lenz that the unit offered for sale would bypass a cable box and allow the user to receive all premium and pay-per-view channels free of charge. However, the price for such a unit was $199.99 rather than $125 as advertised. Lenz ordered the unit and requested Charlie to have it delivered to the post-office box for Creative Alarms, 4150 Sunrise Highway, in Massapequa. Charlie told Lenz that upon delivery full payment would be required by certified check or money order payable to Ken Erny. The following day United Parcel Service (UPS) delivered a package, specifically a white *597 box, to the Creative Alarms post-office box and collected a money order in payment. The return address shown on the package was Ken Erny, 108-11 Liberty Avenue, Richmond Hill. Inside the package was a black metallic object approximately four inches by three inches by one inch with a label that read “RF-Plus Digital Auto Mode.”
Lenz submitted the device to Denis Darnaud, the systems security supervisor at Cablevision. Darnaud tested the device and determined that when attached to a cable box it would allow the user to receive all premium and pay-per-view channels.[2]
Approximately one year later, Lenz saw the same advertisement in the June 2000 issue of Popular Mechanics. On May 25, 2000 Lenz called the number listed in the ad again and spoke with Charlie. Lenz ordered another unit from Charlie and again requested that delivery be made to the post-office box. On May 26, 2000 at about 11:45 a.m., Lenz, who was engaging in surveillance at 35 Stowe Place, Hempstead, observed a red Nissan 300 ZX, with license plate K709SN, pull into the driveway. Lenz observed a white male, approximately 40 years old, with dark brown hair and a medium build, exit the red Nissan and go into the house. At around 1:20 p.m., Lenz saw the same man leave the house carrying a white box similar in size to the box containing the cube which had been delivered by UPS in 1999. The man got into the red Nissan and drove to a UPS center on Oak Street in Hempstead. Moments later, the man exited the UPS center, no longer carrying the white box but instead carrying a yellow slip of paper, resembling a shipping receipt. New York State Department of Motor Vehicles records indicated that the red Nissan was registered to Mario Carratu, 7 Wilson Place, Lindenhurst, New York. On May 30, 2000 a white box containing an identical cube was delivered by UPS to the Creative Alarm post-office box in Massapequa.
Lenz subsequently learned that another investigator at Cablevision, Mike Boylan, had conducted an undercover operation in October of 1997 and purchased a cube from an individual by the name of Robert Carratu. Carratu had used the alias Charlie and drove a red Nissan 300 ZX. Based on the case developed by Boylan, Carratu had been arrested for criminal possession of a forgery device and convicted of theft of services. *598 Lenz viewed Carratu’s arrest photo from the 1997 case and identified him as the man whom he had seen leaving 35 Stowe Place with the white box on May 26, 2000.
On June 16, 2000 Lenz spoke to Charlie and ordered two cubes for an agreed upon price of $385. Later that day, Lenz observed the man, now believed to be Robert Carratu, leave 35 Stowe Place carrying a white box which was larger than the boxes which he had previously carried. When Lenz had not received the cubes by June 20, 2000, he telephoned Charlie and got a UPS tracking number for the package. Lenz then contacted UPS security and learned that UPS had a videotape of the person who delivered the item for shipment under that tracking number. Lenz viewed the videotape the next day and identified the person who delivered the white box as Robert Carratu.
On September 11, 2000, Lenz contacted Charlie on the telephone and discussed the purchase of 10 devices for a price of $165 each. Lenz also complained that one of the cubes which he had purchased in June did not work. On September 13, Charlie instructed Lenz to return the defective cube to “K.E., Dept. 263, 108-11 Liberty Avenue, Richmond Hill.” On November 30, 2000 Lenz visited 35 Stowe Place and recovered numerous UPS shipping receipts from the garbage left at the front of that location. The shipping receipts listed the sender as “Ken Erny, 108-11 Liberty Avenue, Richmond Hill.”
On December 7, 2000 at around 11:45 a.m. Lenz ordered another cube from Charlie. Earlier that morning, Detective Jetter himself had observed the red Nissan, with license plate K709SN, parked in the driveway of 35 Stowe Place. At about 3:50 p.m. that day, the detective observed a man matching the description of Robert Carratu leave 35 Stowe Place carrying a small white box. The man drove in the red Nissan to the UPS center in Hempstead, brought in the white box, and exited a short while later carrying a yellow slip of paper. Lenz received delivery of another cube at the post-office box on December 8, after leaving another money order payable to Ken Erny. On December 11, 2000, Lenz again spoke with Charlie who assured him that he could deliver 10 cubes for an agreed upon price of $165 per cube.
On December 13 at approximately 1:40 p.m., Lenz received information from Detective Fiore, who was conducting surveillance at 35 Stowe Place, that the subject had entered the location carrying some packages. Approximately 10 minutes later, Detective Jetter received a call from Lenz who stated that he *599 had contacted Charlie and placed an order for 10 units. Detective Jetter proceeded to 35 Stowe Place, and at approximately 3:00 p.m. the detective arrested Mr. Carratu as he was attempting to back the red Nissan out of the driveway. -
On the front passenger seat of the car Detective Jetter observed two packages with return address labels showing the name Ken Erny and the address 108-11 Liberty Avenue. The return address labels also showed post-office box 263, corresponding to the “Department” to which Lenz had been told to return the defective cube on September 13. Also found on the passenger seat was a UPS shipping form requesting that one of the packages be sent to Creative Alarms in Massapequa, the address which Lenz had established to receive the cable boxes. After having these items videotaped, Detective Jetter removed them from the vehicle. Detective Jetter also searched Mr. Car-ratu and seized his keys. Before Mr. Carratu was transported from the scene, Detective Jetter asked him whether anyone else was in the house, and Mr. Carratu stated that there was no one.
Following the arrest of Mr. Carratu, Detective Jetter applied for search warrants for the entire premises located at 35 Stowe Place, Hempstead, in Nassau County and for post-office box 263 at 108-11 Liberty Avenue, Richmond Hill, in Queens. 35 Stowe Place is a two-story single-family house. 108-11 Liberty Avenue is a two-story premises which contains a bicycle shop and rental mailboxes on the first floor and a residence on the second floor. The warrant applications were based upon the information which had been developed in the course of the investigation through December 11, 2000. The warrants were issued at 4:15 p.m. on December 13 and authorized searches at both locations for devices capable of defeating the security and encryption system of a cable television operator; devices capable of descrambling telecommunications intended for use by cable television subscribers; parts and equipment used for assembling and repairing such devices; records relating to the purchase, sale, and transportation of such devices; and financial records used in connection with the sale of such items. The warrant covering 35 Stowe Place also specifically authorized search for electronics manuals detailing the installation of devices capable of defeating cable TV security and encryption systems and descrambling telecommunications as well as computers and computer diskettes used in connection with the illegal activity.
Detective Jetter accompanied by various other detectives began the search of the house at 35 Stowe Place at around 4:40 *600 p.m. In the dining room, the detectives found 59 wireless “su-percubes” in cassette boxes, 16 cable converter boxes, 34 cable descrambling devices, and assorted nondigital cubes. Cable converter boxes were removed from television sets in the living room and dining room and seized. Also found within the house was some PC board etching material and three boxes of assorted electronic parts.
In the computer room on the main floor, the detectives found items of identification in various names all but one of which showed the photograph of the defendant. Also found in the computer room was a copier, a Packard-Bell and a Sony Vaio computer, an Altima laptop computer, a computer monitor, a scanner, a printer, a paper cutter, a document shredder, a plastic box with assorted art supplies, and a plastic box with printing and software manuals. A Toshiba laptop computer was found on the kitchen counter. In the computer room, the detectives found a document that appeared to be an application to open a Web site for “novelty I.D.’s,” that is phony forms of identification. The contact information listed in the application was “Edward Trecky, 108-11 Liberty Avenue, apartment 263, Queens, NY.” The detectives also found in the computer room another document which contained a user name and password for Goto.com., a Web site which operates as either a hosting service or a “search engine.”[3] Additionally, found somewhere within the house was a box with three toner cartridges as well as a document laminator. In a briefcase in the dining room, the detectives found UPS shipping receipts, a Citibank checkbook in the name of Ken Erny, a money order and various other personal papers. Also within the dining room were assorted circuit boards. In the living room was a television and a satellite receiver. In the master bedroom closet, the detectives found a box of UPS shipping labels, additional circuit boards, and some boxes of electronic filters. Bundles of cardboard boxes were found in an empty room off the hallway. Finally, the detectives found a box of miscellaneous electronic supplies which were recovered from either the master bedroom closet or the dining room.
In a bathroom off the hallway on the main floor under a vanity, the detectives found a blue plastic box containing two small spiral notebooks, assorted papers, and four smaller plastic boxes. Inside the four smaller plastic boxes were various items *601 of identification, including driver’s licenses, bank cards, Social Security cards, employment ID cards, and correspondence. The driver’s licenses were in the names of Robert Carratu, Ken Emy, Edward Trecky, and Peter Dounis. Driver’s licenses were also found in other parts of the house. Defendant’s photograph appeared on various identification items, some of which were for names other than Robert Carratu. There were also bank cards found in the names of Ken Erny and Edward Trecky. From the lower level of the house, the detectives recovered another cable television access device similar to the ones which had been purchased by Lenz. This cube was attached to the cable line near where it entered the house.
Around 5:00 p.m., the officers executing the search warrant were joined by Detective William Moylan, a computer forensic examiner for the Nassau County Police Department. Inspecting the Toshiba laptop, Detective Moylan observed that there was a text file open on the screen which contained the name and address of an individual. After removing the power sources from the Toshiba laptop, the Packard Bell, and the Sony Vaio, all three machines were taken to Crimes Against Property Squad office for further examination. The search of 35 Stowe Place was completed around 7:40 p.m.
Defendant meanwhile had been taken by Detective Kinsley to the DA Squad office and arrived about 3:15 p.m. Detective Kinsley took Mr. Carratu’s personal property from him and determined that he was carrying $1,062. During the arrest processing, defendant gave Detective Kinsley his pedigree information including name, address, date of birth, and phone number, but the detective could not recall whether he gave his Social Security number. At approximately 3:30 p.m., defendant was advised of his constitutional rights by Detective Kinsley who read the rights to him from a standard police department form. Defendant stated that he understood his rights and was willing to answer questions and signed the Miranda card. At approximately 7:50 p.m., Detective Jetter spoke with Mr. Car-ratu who acknowledged that he had been read his rights by Detective Kinsley and that he was willing to speak with the police. In response to a question as to whether anyone else was involved in the sale of the illegal cable boxes, defendant stated that all of the cubes belonged to him. Defendant made that statement at approximately 7:50 p.m.
While defendant was being held in custody at the DA Squad office, Detective Fiore and Detective Schiller traveled to 108-11 Liberty Avenue to execute the other search warrant. However, *602 no property was recovered from post-office box 263. When the detectives spoke with the manager of the premises, Jose Rivera, he informed them that the man who rented the box, whom he referred to as Ken Erny, had removed all of its contents. Mr. Rivera stated that Ken Erny came to the mailbox quite often and that he had known him over a year.
Between December 14, 2000 and September 11, 2001, Detective Moylan conducted forensic examinations of the three computers which had been taken to the Crimes Against Property Squad office. The initial procedure was to make a copy of the hard drive for each of the systems.[4] Since the Toshiba laptop was protected by a password, it was necessary to remove the hard drive from the Toshiba and attach it to a separate computer in order to copy the hard drive. Then the directory for each of the hard drives was displayed, and the folders for each hard drive were listed alphabetically. Finally, the detective opened each folder and examined each user-generated file to determine whether it contained evidence pertaining to the illegal cable box operation. Within the folders themselves, Detective Moylan observed Web pages downloaded from a Web site for cable boxes. In a folder labeled “Fake I.D.” on the Sony hard drive, the detective observed image files of driver’s licenses, Social Security cards, inspection stickers, and registration certificates. Another driver’s license image was also found in a folder called “My Documents.” In another folder labeled “customers” found in the Toshiba computer, the detective observed a file referring to Creative Alarms. In a folder labeled “DSS,” the detective observed text files which appeared to relate to satellite television.
On October 3, 2001 Detective Jetter returned to 108-11 Liberty Avenue and showed Mr. Rivera an array of six photos which included Mr. Carratu’s picture. Mr. Rivera identified photo number 4, the picture of Mr. Carratu, as Ken Erny, the man who rented mailbox 263. On March 21, 2002 at approximately 4:00 p.m., Mr. Rivera was taken to the Third Precinct by Detective Fiore to view a lineup. As Detective Fiore entered the precinct parking lot, Mr. Rivera noticed the red Nissan and stated, “There’s his car right over there.” Mr. Car-ratu, who was represented by counsel, was a participant in the lineup, along with five police officers. Mr. Carratu chose position number 2. Mr. Rivera immediately identified Mr. Carratu as being Ken Erny, the person who rented the mailbox.
*603 Conclusions of Law
I. The searches of defendant’s vehicle, defendant’s person, and 35 Stowe Place
When a person traveling in an automobile is validly arrested for a crime, the arresting officer is authorized to search the vehicle, and any closed containers visible in the passenger compartment, when the circumstances create a reasonable belief that the vehicle or its contents may be related to criminal activity. (People v Yancy, 86 NY2d 239, 245 [1995].) The court concludes that the officers had ample, probable cause that Mr. Carratu had committed the crime of criminal possession of forgery devices, that is the illegal cable boxes. The court notes that the arrest was based upon an elaborate investigation spanning one and a half years. Lenz, the Cablevision investigator, was a highly experienced and reliable source who had obtained his information through direct dealing with the defendant. By way of corroboration, it was determined that Mr. Carratu had previously been convicted of similar acts, and Detective Jetter himself had made observations implicating defendant in the criminal activity. Accordingly, the warrantless arrest of Mr. Carratu was valid.[5]
Since the information acquired by the officers clearly indicated that defendant used the red Nissan to transport the cable boxes to the shipping point, the circumstances created a reasonable belief that the vehicle was related to the criminal activity. Although the car was located on private property, the circumstances of the case dictated that a search warrant for the vehicle did not need to be obtained. (People v Ciaccio, 45 NY2d 626 [1978].) Specifically, the fact that defendant was in the process of backing the car out of the driveway created a likelihood that he would leave the scene and dispose of any evidence in the car if the vehicle was not stopped immediately. Accordingly, the warrantless search of the vehicle was proper, and defendant’s motion to suppress the property recovered from the vehicle is denied. The court further concludes that the search of defendant’s person at the scene was incident to his lawful arrest. Accordingly, the seizure of defendant’s keys was proper. Finally, the court concludes that all of the tangible property recovered from 35 Stowe Place was validly seized pursuant to the search warrant.
*604 II. The search of defendant’s computer
A defendant has standing to contest an illegal search if he has a subjective expectation of privacy in the area searched that society considers objectively reasonable. (Katz v United States, 389 US 347 [1967].) By placing data in files on the hard drive of his computer, defendant manifested a reasonable expectation of privacy in the contents of those files. (United States v Barth, 26 F Supp 2d 929, 936-937 [WD Tex 1998].) Accordingly, Mr. Carratu has standing to challenge the search of his computer. The substance of defendant’s claim is that the search exceeded the scope of the warrant. Specifically, defendant claims that the officer conducting the search of his computer “made no effort to first examine those files or directories that by their name or nature might indicate some type of record or list * * * [nor did he] check if the nature of the file was graphic, data base, spread sheet or word processing.”
The Fourth Amendment provides: “The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.” (US Const Amend IV.) In view of the Fourth Amendment’s “particularity requirement,” a warrant authorizing a search of the text files of a computer for documentary evidence pertaining to a specific crime will not authorize a search of image files containing evidence of other criminal activity. (United States v Carey, 172 F3d 1268 [10th Cir 1999].)
In Carey a detective, after having obtained a warrant to search a computer for evidence of drug dealing, viewed the directories of the computer’s hard drive. The detective noticed that there were numerous files with sexually suggestive titles which were labeled “JPG,” indicating that they contained images. After downloading the contents of the hard drives onto floppy discs, the detective performed a “key word” search of text-based files, attempting to locate files containing terms which might be used by a drug dealer, but was not successful. The detective then opened one of the JPG files and discovered that it contained child pornography. Rather than seeking a new warrant authorizing a search for files containing child pornography, the detective proceeded to open numerous other image files containing pornographic matter. In opposing defendant’s motion to suppress, the prosecutor argued that the image files were lawfully observed “in plain view” during the course of the search pursuant to the warrant. The prosecutor *605 offered the analogy that officers searching a file cabinet pursuant to a warrant may seize any incriminating documents in plain view which they may find in the file cabinet regardless of whether they are covered by the warrant. Nonetheless, the court ruled that once the first file containing child pornography was opened, subsequent files containing pornography were not “inadvertently discovered” and had to be suppressed. {Id. at 1273.) While granting the defendant’s suppression motion, the court suggested that the result might have been different if the computer files had been “ambiguously labeled.” {Id. at 1275.)
The court will now apply these principles to the search of the computers in the present case. The court concludes first that the Web pages pertaining to the cable box Web site fall squarely within the terms of the warrant. Similarly, the folder labeled “customers” clearly pertained to the illegal cable box operation, and so Detective Moylan was entitled to open it. The folder labeled “DSS,” which contained text files relating to satellite television, was ambiguously labeled. As a result, it was reasonable for Detective Moylan to open that file in search of documents pertaining to the illegal cable box operation. Accordingly, defendant’s motion to suppress is denied as to the computer files relating to the cable box Web site, the customer folder, and the DSS folder.
The court reaches a different conclusion with regard to the image files containing false identification documents. An examination of the supporting affidavit and the warrants themselves makes clear that the search warrants were issued to authorize a search of defendant’s computers for documentary evidence relating to his illegal cable box operation. The court notes that the “Fake I.D.” folder was not ambiguously labeled. To the contrary, the name of the folder clearly indicated that it likely contained false identification documents rather than documents or records concerning the sale of illegal cable boxes. (See Note, Criminal Procedure: Tenth Circuit Erroneously Allows Officers’ Intentions to Define Reasonable Searches: United States v Carey, 54 Okla L Rev 665, 681-682 [2001].) Thus, from mere inspection of the folder name Detective Moylan had probable cause to seek a further warrant authorizing a search of the Sony computer for evidence of possession of forged instruments. And, since the file extension names on the files within the Fake I.D. folder indicated that they likely contained images, they appeared not to contain the type of text files which were akin to the items sought by the warrant.
In Carey, the first file containing pornographic matter which the detective opened was not subject to suppression because it *606 was observed inadvertently. By contrast, when Detective Moy-lan opened the first image file in the Fake I.D. folder, he had reason to believe that it contained a phony identification document. An officer cannot seize evidence under the plain view doctrine when he expects to find the item and discovers that which he was actually seeking. (People v Manganaro, 176 AD2d 354 [2d Dept 1991].) Since none of the image files containing false identification documents was inadvertently discovered, the People cannot rely on the plain view doctrine to justify the search for those image files.
Because the My Documents folder was ambiguously labeled, if that folder had been opened first, Detective Moylan would have had no reason to suspect that it contained a file containing an image of a false identification document. However, the burden of proof as to the applicability of the plain view doctrine, as with all exceptions to the warrant requirement, is squarely on the prosecution. (People v Knapp, 52 NY2d 689 [1981].) The People did not establish at the hearing which of the image files was opened first. Thus, there is no basis for the court to conclude that the image file in the My Documents folder was opened inadvertently. In these circumstances, defendant’s motion to suppress is granted as to all computer files containing images of false identification documents. Defendant’s motion to suppress physical evidence is in all other respects denied.
III. Statements and identification testimony
The court concludes that defendant was subject to custodial interrogation when Detective Jetter asked him at the scene whether anyone else was in the house. Since defendant had not yet received the Miranda warnings at that point, defendant’s motion to suppress his statement at the scene that there was no one in the house is granted. However, the court concludes that defendant was adequately advised of his Miranda rights at the DA Squad office and knowingly and voluntarily waived them. Defendant does not make any claim that his statement at the DA Squad office was made on constraint of his previous un-Mirandized statement at the scene. Accordingly, defendant’s motion to suppress his statement at the DA Squad office that all of the cubes belonged to him is denied.
Defendant has not carried his burden of proof that the photographic or lineup identifications by Jose Rivera were in any way suggestive. The court notes that Mr. Rivera’s observation of the red Nissan was inadvertent and thus did not taint the lineup. (See People v Suber, 282 AD2d 480 [2d Dept 2001].) *607 Indeed, the fact that the witness knew the car which defendant drove suggests that the identification may have been merely confirmatory. (People v Espinal, 262 AD2d 245 [1st Dept 1999].) Accordingly, defendant’s motion to suppress identification testimony is in all respects denied.

. Prior to his employment with Cablevision, Lenz had been a member of the Nassau County Police Department. While working for Cablevision, Lenz had previously been involved in other investigations in which “cubes,” or illegal cable boxes were purchased by undercover investigators.

. Lenz was informed by cable TV security experts that the cube blocks communications between Cablevision’s central computer and the subscriber’s cable converter. A computer chip within the cube is programmed with Cablevision’s computer data and instructs the subscriber’s converter to unscramble all of the program transmissions.

. A search engine is a Web site which directs persons who access the Internet to other Web sites offering products, services, and all types of information.

. Because the Sony computer, which was newer, contained a recent copy of the Packard Bell hard drive, Detective Moylan did not actually copy the Packard Bell hard drive directly from the Packard Bell machine.

. Upon the same basis, the court concludes that the search warrants were validly issued.